THE STATE v. SMITH.

1. Criminal Law: JURORS: OPINIONS FORMED. The fact that a juror has formed and expressed an opinion as to the guilt of the prisoner is no ground for his rejection upon challenge for cause, where upon further examination he states that he has not formed or expressed such an opinion as would prevent him from rendering a true verdict upon the evidence submitted on the trial. (Code, § 4405, par. 11; *State v. Vatter*, 71 Iowa, 557.)

2. Homicide: EVIDENCE OF ASSAULT. In this case, the only evidence of any violence done by defendant to the deceased, except the wounds and bruises visible on her body, was the testimony of one who was to a certain extent impeached as to some portions of his testimony, and who was at first supposed to be an accomplice in the crime, and was arrested and lodged in jail as such; but *held* that the weight of this testimony was a matter for the jury, and that this court could not interfere with their finding therefrom that defendant had been guilty of the violence testified to by the witness.

3. ———: MURDER IN SECOND DEGREE: WOUNDS CONTRIBUTING TO DEATH. The evidence in this case was to the effect that the wounds inflicted upon deceased by defendant were not sufficient to cause her death without the concurrence of other causes, and that other contributing causes were disease of the heart, and intoxication; and the court instructed the jury that if defendant inflicted the wounds with malice aforethought, express or implied, and if, but for the same she would not have died, then he is guilty of murder in the second degree, even if at the time she was affected with heart disease, or afflicted with intoxication, and they contributed also to her death. *Held* that the instruction was correct.

4. ———: MANSLAUGHTER: PUNISHMENT. There is nothing in the facts of this case (see opinion) to justify this court in interfering to mitigate a sentence of six years in the penitentiary for manslaughter, the decedent being defendant's wife.

*Appeal from Jones District Court*—HON. JAMES D. GIF-FEN, Judge.

THURSDAY, OCTOBER 20.

THE defendant was indicted for murder in the second degree. He was tried, and convicted of the crime of manslaughter, and he appeals.

*Remley & Ercanbrack* and *Sheean & McCarn*, for appellant.

*A. J. Baker, Attorney-general*, for the State.

ROTHROCK, J.—I. The first point made by counsel for appellant is that the court erred in overruling certain challenges for cause, interposed by the defendant to several of the persons called as jurors in the trial of the case. The ground of these challenges was that the jurors to whom objection was made had formed opinions upon the merits of the cause, and were so prejudiced as to be disqualified to try the case. All of these persons were examined and cross-examined as to their condition of mind with reference to the charge made against the prisoner; and, in the course of their examination, they each stated that they had not formed or expressed such opinions as would prevent them from rendering a true verdict upon the evidence submitted on the trial. It was thus made to appear to the court that they were not disqualified as jurors, by reason of their state of mind with reference to the crime charged. (Code, § 4405, sub. 11.) The course of examination of the jurors and their answers was very nearly the same as in the case of *State v. Vatter*, 71 Iowa, 557, in which we held that there was no error in overruling the challenges for cause.

II. The defendant was charged in the indictment with the murder of Betsy Smith, who was his wife. She was last seen alive on the evening of the 24th day of February, 1886. On the next morning she was found dead in the bed occupied by herself and her husband.

*1. CRIMINAL law: jurors: opinions formed.*

*2. HOMICIDE: evidence of assault.*

There was but one witness who testified directly to acts of violence by the defendant toward the deceased. The name of this witness was Charles Duffy, who for some time prior to the alleged homicide had been living or boarding with the defendant. Duffy and defendant were in the city of Anamosa on the 24th day of February, 1886, and in the afternoon of that day the defendant returned to his home some three or four miles distant. Duffy returned from Anamosa later in the day, and arrived at defendant's house about dark. The testimony of this witness is quite voluminous, and, without setting it out in detail, we will state some of the principal facts stated by him in his examination as a witness upon the trial. When he reached the defendant's home, he saw the deceased standing in the door of a privy about 45 feet from the house, and the defendant was near the kitchen door picking up stove-wood. She called him a brute. The witness went into the house and the defendant locked the kitchen door on the inside, and went to the stable to do chores. The deceased came to the kitchen door, and asked to be let in, and the witness opened the door and let her in. She attempted to sit down on a chair, and fell off the chair on the floor, and witness assisted her and helped her up on the chair. She was very much intoxicated. The witness went to the stable, and met the defendant, who said the deceased was drunk. The two men returned to the house, and found the deceased sitting where the witness had left her. The defendant took hold of her and gave her a shake, and she fell on the floor. He took her by one arm, and attempted to pull her into the sitting room. Witness told defendant not to do that, and then both of the men took hold of her, and put her in the room, and left her on the floor. The defendant kicked her twice, and called her a drunken beast, and complained of the habits of his wife, and how long he had endured it, etc. After talking for some time the defendant said: " I'll go back and see if she is sober, and if she is she has got to leave this place." He went in the room where she was lying,

and took hold of her by the feet and dragged her out of the house some eight or ten feet from the door, and kicked her two or three times, and left her there. Thereupon the witness raised her up, and took her through the kitchen into the sitting-room. The defendant followed in, and took her by the hand, and pulled her round the room trying to wake her up, and saying that she would have to leave the place; that he would not have her around any longer. After talking for a while about his misfortune in having to live with such a woman, he requested the witness to light a lamp that he might put her to bed. The witness did as directed, and left the house, and, as we have said, the woman was found the next morning in the bed, dead.

We have recited this much of the testimony of Duffy for the purpose of showing the violence which the state claimed upon the trial was inflicted upon the person of the deceased by the defendant. It is not to be denied that the witness was to a certain extent impeached by contradictory statements as to where he lodged on the night in which the deceased died; and it is admitted that, early on the next day, he disappeared from the neighborhood, and was afterwards found several miles away, and arrested and lodged in jail as a supposed accomplice in the alleged crime. But we are not prepared to say that the jury were not warranted in finding, from the evidence, that the defendant assaulted the deceased, and used the violence testified to by Duffy. And we may say in this connection, and without further elaboration or discussion, that we find no error in the rulings of the court on objections to the introduction or exclusion of evidence.

III. A *post mortem* examination of the body of Mrs. Smith was had on the 25th day of February, 1886. Dr. S. J. Adair, a physician and surgeon, assisted in making the examination. He was introduced as a witness by the state. His examination in chief was as follows: " Was present at the *post mortem* examination of Mrs. Bessie Smith on February 25th.

3. ———: murder in second degree: wounds contributing to death.

The body was lying on the bed.   Dr. Gawley was with me
and conducted the examination.   The body had on a short
dress, a skirt, and some underclothing.   The clothing was
more or less soiled, wet, and muddy.   We made the exam-
ination there upon the bed.   We found the nose and upper
lip pretty badly bruised, and the lip was swollen somewhat;
some small cuts about the nose and upper lip, and there was
a bruise on one side of the head—I think up about the
temple, I think on the left side; some small bruises over the
top of the head, and some bruises on the forehead, and quite
a long bruise on the right side of the jaw.   The skin was
kind of knocked off—it seems to me on the left side.   Dr.
Gawley and myself made a written memorandum of the con-
dition of the body at the time.   The bruise on the nose
might have been produced by falling on the face, or by a
blow.   I think these are all the injuries we found about the
head or neck.   We found a heavy bruise at the upper part
of the breast bone—quite a large, deep bruise.   It was oval
shaped or round—the external part.   My judgment of that
was that it was struck with something—with what I don't
know—with force; I would think with a blunt instrument.
I noticed some scratches—I think, on the hands.   There
was some skin knocked off.   We found some bruises about
both knees, where the skin was knocked off—both knees and
shins, and on one thigh, there was a kind of circular mark
that showed little punctures through the skin, as if it might
have been made by a boot heel.   I thought there was a
bruise on the thigh; but I thought it might have been from
lying there—the blood had settled there.   I think if she
had lain on her back after being dead that there would be
that appearance there—it would account for it.   There
seemed to be no particular bruising.   I supposed the blood
had settled there.   We examined the back of the body, and
found no bruises there.   These were the external appear-
ances.   We then used the knife.   On the head we found that
the blood had settled between the scalp and the bone.   There

seemed to be little points that projected through the scalp. I would say that would be an indication of force having been applied. The bruise over the left eye, on the side of the face, showed to be quite a bruise to quite a little depth. It showed settled blood to indicate considerable force. It might have been done by falling over a stick of wood, or by a stroke from some kind of a blunt instrument. A man's fist, I think, might make it. The bruise on the breast—the skin was broken a little towards the central portion. It extended to the bone pretty much. It indicated that there was force used there—more force than at any other wound that I saw. There was quite a large wound on both knees—about as large as a half-dollar—a little larger. I think I could account for them. The woman might have fallen down on the floor, on her knees, or scraped them along in some way, or been pulled violently on the floor on her knees. The wound was on the front part of the knees. We did not examine what I thought was a wound on the thigh. It didn't seem to be of any great importance. We made an examination of the internal organs of the body. We opened the chest cavity and abdominal cavity, examined the lungs, and liver, and heart, and arteries and veins in connection with it. We found them all normal. I believe we came to the conclusion that the liver, perhaps, was a little enlarged. There was no apparent trouble with the lungs— no enlargement of the lungs. The heart appeared to be of normal size and natural weight. We examined the inside of the heart, and there appeared to be no trouble of ever having been any inflammation or difficulty with the valves. The cavities appeared to be all normal. Found no impediment in the circulation. We opened the stomach and found fluid in it that we thought might be beer, or something of that kind. The presence of intoxication was manifest from the examination. From the examination we made, I didn't consider the injuries sufficient to account for her death—not of themselves. My idea of it was that the woman had probably

been drinking, and, from the appearance of the clothing, that she had been out in the wet, and that she died from the effects of exposure, and probably died from the effects of the three causes combined—the drinking, and the bruising and the exposure. Taking the combination of injuries found on her person, in my opinion, they contributed to, or accelerated, her death in some degree. The bruises, the intoxicants, and the exposure—I thought those three things were the cause of her death." In his cross-examination, he stated that a fibrinous clot was found in the left ventricle of the heart.

Dr. E. W. Gawley was also present at the *post mortem* examination. He was examined as a witness for the defense. He testified as to the condition of the heart, as follows: "We found the heart, externally, apparently normal; but, in opening the heart, we detected in the left ventricle a fibrinous clot, fully an inch long, and, perhaps, one-half or two-thirds of an inch across. You could stretch it so that it would be three-fourths of an inch across; and, if you rolled it up, it would be only one-fourth of an inch in diameter. It was a fibrinous clot—a clot composed of the fibrinous portion of the blood. It forms in the heart usually on the side of the ventricle. It does not form in the current of the blood—the current going in the center, and the clot forming on the side. There is no difficulty in determining whether it is a fibrinous clot or a blood clot. A fibrinous clot is composed of fibrine, almost entirely; and a blood clot is composed of the natural ingredients of the blood. I took this fibrinous clot out and examined it. My opinion at the time was that that clot was formed in that ventricle of this woman's heart before she died, and that is my opinion now. We found blood clots, also. We nearly always find blood clots in the heart— nearly always small. These are formed after death. These fibrinous heart clots sometimes cause very sudden death. Sometimes a small portion of the clot breaks off, and is carried off into the circulation until it comes to some place, usually in the brain, where it can go no further, and it dams

up the blood and causes paralysis and death; and sometimes it becomes entangled with the valves of the heart, and then it causes death, and sometimes it dams up the valves of the heart entirely, and causes death by suffocation. If you displace the clot, and choke up the valves, it is almost instant death. It is liable to be displaced by increased action of the heart, usually caused by great exertion, or violent exercise, or excitement—anything that makes the heart beat violently. Drunkenness would have that tendency. If this woman was not dead, and I was called to treat these wounds that we found, I would not consider them even serious. There was no wound sufficient to cause death, nor were they when all put together sufficient to cause death— I think not. Her intoxication, and the condition of her heart, might produce death. Our examination of the body was reduced to writing by me. I read it over to Dr. Adair, and he read it over himself, and signed it." There was other evidence to the effect that the deceased had complained of trouble in the action of her heart, and that she had at several times taken medical prescriptions therefor.

It will be observed that there is a concurrence in the medical testimony that the wounds found upon the body of deceased were not sufficient to cause her death without other concurrent causes, which were disease of the heart, and her intoxicated condition. In other words, if the deceased had been a healthy woman, and had not been intoxicated, the jury would not have been warranted, from the evidence, in finding that she came to her death from the acts of the defendant. The court instructed the jury upon this branch of the case as follows:

"(8) If, at the time and place charged, the defendant with malice aforethought, either express or implied, assaulted the deceased, and inflicted upon her wounds and bruises which produced her death, or contributed to her death, then he is guilty of murder in the second degree, and you should so find.

"(9) If the defendant, with malice aforethought, express

or implied, kicked, beat, or struck the deceased, thereby inflicting on her body or head or face any wound or wounds, or bruise or bruises, and if the same or any of the same caused her death, or contributed to and hastened her death, then defendant is guilty of murder in the second degree, and you should so find. Or if defendant, with malice aforethought, express or implied, caught the deceased by the feet or legs, and by the same dragged her over and across the floor of the house to the door, and thrust her out upon the ground, into the wet and mud and open air, and such treatment caused her death, or in any manner contributed to and hastened it, then he would be guilty of murder in the second degree, and you should so find. . In other words, if defendant, with malice aforethought, either express or implied, inflicted any of the injuries, as charged, upon the body or person of the deceased, and the same caused her death, he would be guilty of murder in the second degree, although you may find other causes contributed thereto also.

· "(10) The law is this: If one, with malice aforethought, either express or implied, inflict an injury upon or to the person of another, which causes death, and which death would not then have occurred but for such injury so inflicted, the person inflicting such injury is guilty of murder in the second degree; and in such case it is no defense if another cause or other causes may also have contributed to such death. And in this case, if defendant inflicted any of the injuries, as charged, upon the body or person of the deceased, and if, but for the same, she would not have then died, then he is guilty of murder in the second degree; and this would be so even if at the time she was affected with heart disease, or afflicted with intoxication, and they contributed also to her death."

It is claimed by counsel for the defendant that these instructions are erroneous. It is said that there might have been three causes contributing to the death of the deceased: (1) heart disease, a natural cause; (2) intoxication, and

exposure to cold caused by it; and (3) the wounds inflicted by the defendant; and the argument is that, where there are three causes which may have contributed to produce death, one natural cause and two artificial causes, a charge that death proceeded from one artificial cause, when the proof is that it was only accelerated by that cause, but in fact proceeded from the other artificial cause, is not sustained by the evidence. Section 141, 3 Greenl. Ev., is relied upon as sustaining the proposition contended for. The case cited by the author was a charge of causing the death of a child by exposing it to the cold, and the proof was that it was found exposed in a field alive, but with a mortal contusion on its head, and that it died in a few months afterwards; and it was held that, if the death was only accelerated by the exposure, the charge was not supported. In Wharton's Criminal Law, § 155, it is said the case put by Greenleaf cannot be sustained, because, if the exposure accelerated the death, it "caused" the death. See, also, sections 153, 157, 160, 309, 310, and authorities cited. See, also, *State v. Castello*, 62 Iowa, 404; *State v. Morphy*, 33 Id., 270.

In our opinion, the instructions complained of are correct. It surely ought not to be the law that because a person is afflicted with a mortal malady, from which he must soon die, whether his ailment be caused by natural or artificial causes, another may be excused for acts of violence which hasten or contribute to or cause death sooner than it would otherwise occur. Life at best is but of short duration, and one who causes death ought not to be excused for his act because his victim was soon to die from other causes, whatever they may be, and in the case at bar we think the jury were warranted in finding that the violence of the defendant contributed to or caused or accelerated the death of his wife.

IV. The judgment of the court was that the defendant be imprisoned in the penitentiary for six years. It is claimed

4. ——: manslaughter: punishment. that the punishment is excessive, and we are asked to reduce it. The facts in the case do not seem to us to demand our interference. AFFIRMED.