[Criminal No. 768.   Filed October 18, 1932.]

[15 Pac. (2d) 255.]

JENNIE RUTLEDGE, Appellant, v. STATE, Respondent.

Messrs. Cox, Moore & Janson, for Appellant.

Mr. K. Berry Peterson, Attorney General, Mr. Renz L. Jennings, Assistant Attorney General, and Mr. Lloyd J. Andrews, County Attorney, for the State.

LOCKWOOD, J.—Jennie Rutledge, hereinafter called defendant, was informed against for the crime of murder. She was duly tried before a jury, which found her guilty of manslaughter, and she was sentenced to serve from seven to ten years in the state penitentiary. From the verdict and judgment thereon she has appealed.

There are some five assignments of error which we will consider in the light of the legal questions raised thereby.

The first is in effect whether or not the evidence sustains the verdict. In considering this question, we must necessarily state briefly the facts. The evidence, taken in the strongest light in favor of the state, as under our oft-repeated rule we must take it in an appeal of this nature, shows the following facts: Defendant resided in Phoenix, Arizona, together with her son and daughter-in-law and her mother, Alice Pyle, a woman about 85 years old. On the night of April 17th, 1931, defendant was observed by several witnesses cursing and beating her mother and threatening to kill her. The matter was reported to the sheriff's office, and early on the morn-

ing of the 18th an investigator from the office went to the Rutledge house, where he found Mrs. Pyle lying on a bed, alone in the house and unconscious. She was immediately taken to St. Joseph's Hospital and there examined by two physicians. Her body appeared almost completely covered with bruises, new and old, and many scratches, and she showed some signs of a concussion of the brain. She died on April 19th without having recovered consciousness. It is urged by defendant that the evidence fails to show the beating which the witnesses testified she gave her mother was the cause of the death, but that she died of pneumonia. The testimony of Dr. Mauldin, the county physician, as to the cause of death was as follows:

"Q. Doctor, from your examinations there what would you say caused the condition that you found there on the head and body of Alice Pyle? A. Well, the only thing I could say, that it was caused by some external violence, just what that was I am unable to say.

"Q. Now Doctor, from the examination that you conducted there in company with Dr. Craig, as you say, and from the disclosures that that examination afforded you, what would you say was the cause of the death of Mrs. Pyle? A. The condition that we found, I am of the opinion that her death was immediately caused by the accumulation of fluid in the bronchial tubes, that shut off her breathing, and that was the immediate cause of death. I would say that the contributory, or the cause of this condition, was from the woman being very old and delicate, that the violent blows, if it was blows, that caused the mild concussion of the brain and the various injuries that she had to her body, brought about a condition of shock, and in this condition of shock, a woman with a very weakened circulation caused from that, would soon begin what we call hypostatic pneumonia, which is what we found in the lungs, I think was caused from that.

"Q. From your examination and your investigation of the abrasions and bruises that you saw on the head, face and body of this old lady, what is your opinion as to how those were caused? A. The only answer I can give to that is that it was caused by some external force or violence; those long lacerations in the skin would indicate that something had been brought in contact with the skin with a violent force, in a dragging force, as though it started and was brought down in a dragging condition, and the bruise on the head and under the left eye was caused by some different external force or violence that came in contact, as a blow or something of that description."

Dr. Craig, the resident physician at St. Joseph's Hospital, who also examined her, testified as follows:

"Q. Doctor, basing your answer on the disclosures made to you there by virtue of your examination of Alice Pyle, what would you say caused her death? A. Will you repeat the question? (The question was read by the reporter.) A. Her death was caused primarily, the primary cause of death was bilateral bronchial pneumonia, senility, concussion of the brain.

"Q. And having in mind those conditions which directly resulted in her death, what in your opinion caused those conditions? A. In the first place her age was against her, being in bed, which would predispose to her catching pneumonia, and the concussion would lower any resistance she might have towards catching pneumonia.

"Q. Now calling your attention to the various conditions on her head and face and body that you have described to the jury, what in your opinion caused those conditions? A. Some external violence. It would be hard to say whether anything—just exactly what did cause it."

It is the general rule that in a homicide case, if deceased was in feeble health and died from the combined effects of the injury and his disease, or if the injury accelerated the death from the disease, he who

inflicted the injury is liable, although the injury alone would not have been fatal. The same rule applies, although the disease itself would probably have been fatal, if the injury accelerated death. We think the Supreme Court of Iowa in *State* v. *Smith*, 73 Iowa 32, 34 N. W. 597, correctly states the law as follows:

"It surely ought not to be the law that because a person is afflicted with a mortal malady, from which he must soon die, whether his ailment be caused by natural or artificial causes, another may be excused for acts of violence which hasten or contribute to or cause death sooner than it would otherwise occur. Life at best is but of short duration, and one who causes death ought not to be excused for his act because his victim was soon to die from other causes, whatever they may be."

See, also, *State* v. *O'Brien*, 81 Iowa 88, 46 N. W. 752; *Hollywood* v. *State*, 19 Wyo. 493, 120 Pac. 471, 122 Pac. 588, Ann. Cas. 1913E 218; *People* v. *Moan*, 65 Cal. 532, 4 Pac. 545; *Gardner* v. *State*, 44 Tex. Cr. R. 572, 73 S. W. 13; *Regina* v. *Plummer*, 1 C. & K. 600, 47 E. C. L. 600.

We are of the opinion that the foregoing medical testimony was sufficient to justify the jury in finding that the death of Mrs. Pyle, if not immediately caused by the beating inflicted upon her by her daughter, was at least accelerated thereby.

The next question is as to the admission in evidence of a certain plat of the Rutledge premises and the vicinity. It is alleged that the witness who prepared the plat testified that it was not drawn correctly to present the object it purported to represent. It appears from the reporter's transcript that the plat in question was first used by the witness for the purpose of explaining and illustrating his testimony, and that he stated that it was a rough sketch not drawn to scale, but that the distances indicated thereon were correct. The court then admitted the

sketch in evidence. The court has had a somewhat similar question before it in the case of *Young Mines Company, Ltd.*, v. *Blackburn*, 22 Ariz. 199, 196 Pac. 167. Therein we state as follows:

"If a map or diagram is offered as an independent piece of evidence, its correctness must be proven as a prerequisite to its introduction, but, where the purpose of its use is to illustrate what the witness is saying, such strict proof is not necessary. It is a common practice in all *nisi prius* courts to allow witnesses, while on the stand, to make drawings for the purpose of making their statements more fully understood. It is not required that such drawings be absolutely correct, but sufficiently so to enable the jury or the court to understand better the statements of the witness. In the case of *Jordan* v. *Duke*, 6 Ariz. 55, 53 Pac. 197, this court used the following language in disposing of an assignment of error based on the admission in evidence, to illustrate testimony, of a map of which it was claimed it was not shown to be correct:

" 'Appellants insist that before a map can be admitted in evidence it must be proved to be correct. That is not always the case. If it is to be used in evidence as a substantive and independent piece of evidence, the appellants are correct, but if it is only to be used as an illustration of what the witness details, no such proof is necessary; but in this instance the maps were proven to be correct representations of the lines connecting the objects pointed out to the surveyor by Ferguson. It is not necessary that the map should be able to stand the tests of Ferguson's evidence as to the particular monuments being the correct monuments of the locations testified to by him. The maps were used in connection with the evidence of witnesses that they might show to the jury that which they were endeavoring by words to explain; and, being used for that purpose, the practice is too common in *nisi prius* courts and too well settled by appellate courts to meet with anything but our approval.' "

We are of the opinion the entire transcript shows that the map was used for the purpose of illustrating

and explaining the answers of the witness, and not as a substantive and independent piece of evidence. It is true it might have been better had the trial court's instructions explained and limited the purpose of its introduction, but no instruction along this line was requested, and counsel for defendant, after the general instructions had been given, stated that they did not wish any other instructions. We think under the circumstances it was not error to admit the map in question.

The next objection is that the county attorney in his opening statement said that he intended and expected to prove certain matters which he failed to prove before the state rested its case. It is urged that, when counsel fails to substantiate an offer of proof made in his opening statement, he must before he closes his case specifically state to the jury that such failure has occurred, and that he withdraws the statement, and in support of this we are cited to the case of *Johnson* v. *United States*, (C. C. A.) 215 Fed. 679, L. R. A. 1915A 862. In that case defendant was convicted on two sets of counts, and the court sustained one conviction and set aside the other, but remanded the case for resentence on the counts on which the conviction was sustained. Nothing was said in the original opinion about the failure of the prosecuting attorney to withdraw the offer of proof made in his opening statement, and it was on the motion for rehearing that the court used the following language:

"In his opening statement the government's attorney said: 'Another immoral purpose is one too obscene to mention, the purpose being for defendant to compel these women to commit the crime against nature upon his body. We will demonstrate that beyond any reasonable doubt to you, gentlemen, before the close of this case.'

"We must assume that the government's attorney, when he made the statement, believed he could pro-

duce the evidence. But at some time before he closed he knew that the picture he had drawn of the negro pugilist could not be verified. Yet not until after defendant's attorney had made a motion to that effect after the close of the government's case were the crime against nature counts withdrawn from the consideration of the jury. A desire, if not a duty, to be fair should have led the government's attorney to withdraw that heinous charge the moment he knew it could not be substantiated.

"Similarly with respect to the unsupported statement: 'It will further appear that from time to time as he had the three women with him about the country, because of their differences and other reasons, he would drop one of them off and put her into a sporting house temporarily, to relieve himself of the necessity of spending money carrying her about the country while he had the others.' "

The circumstances of the case were peculiar, and the remarks made by counsel for the government under those circumstances were well calculated to arouse the prejudices of the jury in the highest degree, but even then the court did not hold it reversible error, but merely censured counsel for his failure to withdraw the remarks and his general attitude through the trial. It is only in case the court is of the opinion that the remarks of counsel were so prejudicial as to give reasonable ground to believe that the verdict was a miscarriage of justice that cases should be reversed on this ground. If counsel for the state are to be held to full proof of every matter set forth in the opening statement upon penalty of a reversal of the case if they fail to make such proof and inadvertently forget to withdraw the avowal, it would be a harsh rule indeed, and in many cases subversive of justice. If the offer made was of sufficient importance so that the jurors remembered it at all, they would be bound to know that the state had failed to make proof thereof, and such knowledge on their part would accomplish every-

thing which a formal withdrawal by counsel could. Unless it clearly appears to the trial court that the statement was made for the purpose of prejudicing the jury, we think no reversible error is committed by a failure on the part of the state to formally withdraw matters which it has stated would be proved and on which no proof had been offered.

The last question is as to certain remarks of counsel for the state in his arguments to the jury. The remarks now complained of are in some respects objectionable, and, had seasonable exception been taken thereto, the court would no doubt have struck them and admonished the jury properly. It appears, however, that they were allowed to pass without objection by counsel for the defendant. Under the rule laid down by this court in *Britt* v. *State,* 25 Ariz. 419, 218 Pac. 981, and *Strickland* v. *State,* 37 Ariz. 368, 294 Pac. 617, we cannot consider remarks of this kind if timely exception is not taken thereto, unless it appears affirmatively on the whole case that the general conduct of counsel for the state has been such that it must be presumed to have resulted in a miscarriage of justice. This we cannot say occurred in the present case. We have examined all the assignments of error and the entire record, and are satisfied that no reversible error appears therein. The judgment is affirmed.

McALISTER, C. J., and ROSS, J., concur.