## 26809. NELSON *v.* THE STATE.

244

Decided July 15, 1938.

*E. O. Blalock, M. L. Preston,* for plaintiff in error.

*John S. Gibson, solicitor-general,* contra.

MacIntyre, J. Harvey Nelson was indicted for the murder of his wife. He was convicted of voluntary manslaughter, and he excepted to the overruling of his motion for new trial. The indictment charged that the defendant "did kill and murder by striking, hitting, beating, and wounding the said Mrs. Harvey Nelson with his fists and with a blunt instrument to the grand jury unknown, which the said Harvey Nelson then and there held and giving to the said Mrs. Harvey Nelson then and there a mortal wound of which mortal wound the said Mrs. Harvey Nelson

died." In another count the indictment further charged that he did murder the said Mrs. Harvey Nelson, "he then and there being her lawful husband, and she the said Mrs. Harvey Nelson being then and there seriously ill and then and there requesting the said Harvey Nelson to get a doctor to treat her [and he] did then and there willfully fail and refuse to procure the services of a doctor to treat her, from which willful omission the said Mrs. Harvey Nelson then and there died." The case made by the State's witnesses may be stated as follows: Mrs. Nelson died on Thursday night, December 10, 1936. On Monday next preceding her death, the defendant had a "faith doctor" to attend her. He found her in bed, and upon examination found severe bruises about her body. She also had a black eye. He advised the defendant to call a "medical doctor." On several occasions, ranging in time from one year to a week or so before Mrs. Nelson's death, the defendant beat her with his hands and fists and with other instruments unknown. On Saturday night, about midnight, Mrs. Nelson, in company with a girl friend, caught a ride from the filling-station which she and the defendant ran, with two young men, to the adjoining town. The defendant found her shortly after they reached town, ordered her into his car, and threatened to beat h——— out of her when he got her home. Some several hours later, and about an hour and a half before sunup, she appeared at the home of a neighbor with large bruises about her face and body, and blood between her lips. On Wednesday the defendant was advised by a neighbor to get a doctor. On Thursday afternoon, through the efforts of neighbors, a doctor came and examined her. One of the neighbors who had sent for the doctor paid him for his services, and had filled and paid for a prescription he gave. Mrs. Nelson stated in the defendant's presence that he had whipped her and bruised her up. The defendant renewed a policy of life insurance on his wife's life on the night before her death.

The defendant introduced several witnesses who testified to the fact that Mrs. Nelson drank intoxicating liquors to excess, and that she stayed under their influence most of the time. This evidence was not contradicted by any evidence of the State. Two witnesses for the defendant testified to having seen her up, walking about, on Wednesday before her death on Thursday. The evidence for the State does not make it clear when Mrs. Nelson took to her

bed with her last illness. The doctor who attended her, and who testified that she died with uremic poisoning (the testimony of this witness is set out in detail hereinafter), would not state exactly how long, in his opinion, the deceased had been suffering therefrom. Dr. W. A. Sibett was sworn on behalf of the defendant, and testified that in May, Mrs. Nelson visited his office with throat trouble; that during his treatment she complained that she was having some trouble with her back; that she thought her kidneys were giving her trouble; that he examined a specimen of her urine and it contained albumen, pus, and other inorganic substances; that she had a chronic kidney condition which was serious; that he referred her to another doctor; and that drinking liquor would cause and aggravate her condition. He further testified: "I guess a person suffering from that poisoning in their system, that excitement alone will accelerate the disease. I know so absolutely from a professional standpoint. I think severe beatings would accelerate the disease and cause the poison to spread more rapidly, by getting the blood stream stronger and hotter. I think, after it reached a chronic stage, those beatings and excitement attendant thereto would accelerate the death—make the disease kill them quicker. It is true that a beating of a stronger, husky, brawny man that wouldn't hurt him much would probably kill a person weakened by poison in their system." Dr. J. W. Wallace, another witness for the defendant, testified that he saw Mrs. Nelson in the afternoon of the day she died; that he found her in an unconscious condition; that he found bruises on her body; that he, together with Dr. Clark, performed a post-mortem examination of her body; that uremic poison caused her death; that whisky would cause this condition; that beating a person on the outer surface of the person would not cause uremic poisoning; that her liver was greatly enlarged, about two or three times its normal size; that in his opinion she had suffered from liver trouble months, or perhaps years, before her death; that he could not state how long she had had uremic poisoning before he saw her; and that he did not think the bruises contributed to her death. On cross-examination he testified: "It is true that if a person is suffering from a bad liver and from uremic poisoning, that excitement alone will accelerate that disease. . . Any excitement, especially when they are diseased that way, will make them die quicker; even excite-

ment. And the excitement attending the beatings, and the bruises and scars and contusions on her body, will certainly accelerate it some, and make a person die quicker. The bruises—but the excitement is probably more cause. Putting bruises on there during the excitement would cause it. In a small way those acts would contribute to her death; the excitement would. I don't think the bruises would. The excitement came from the beating. A man that is big and strong and young and clear of disease could stand a beating, without bad results, that would kill a person that was laboring under disease; he could stand more punishment, and not kill him or hurt him seriously, that a person that was weakened that beating would kill. I couldn't tell the full extent of those bruises; only they were just superficial; they had been there probably, I would say, not over somewhere around forty-eight hours, at least."

■ The defendant contends that there was a variance between the indictment and the proof, because the evidence showed that the death was not occasioned by the whipping alone, but that it was the disease of the wife which made the assault mortal, and the fact that she was diseased at the time of the whipping should have been averred in the indictment, in order that the defendant might have understood the precise nature and character of what he was charged with, and thus be enabled to prepare his defense. We think the indictment sets out in full and distinct terms the acts of the defendant which hastened the death of the deceased; and we do not think it necessary for the indictment to allege the state or condition of the body of the deceased at the time of the whipping, or causes merely natural, then existing, which tended to make the acts of the prisoner more dangerous and fatal. Thus, when the indictment alleges the criminal acts of the defendant which constituted the whipping, it has alleged the efficient proximate cause of the death. There was no variance because the indictment did not allege whether the deceased was a sick or a well person, and what was the name or character of the disease, as shown by the testimony, from which the deceased was suffering. It alleged what the defendant did. It alleged his acts which the State claimed were criminal. What the deceased did, or what were her natural frailties, were not necessary allegations in the indictment. Com. v. Fox, 73 Mass. 589; Burnett v. State, 82 Tenn. 439, 443.

■ It is at once apparent that but for the evidence of the defendant's witnesses to the effect that the deceased was suffering from a disease, and that the effect of the assault made on her by the defendant was to accelerate her impending death, no case would have been made against the defendant. ·The evidence for the State failed entirely to show the cause of her death, or any connection between the bruises alleged to have been inflicted on her by the defendant and her death. As a general principle, it may be said that to create criminal responsibility for homicide, the death must have resulted from the malicious conduct of the defendant or from his criminal negligence. Wharton on Homicide, 30, § 27. If one be afflicted with a mortal disease, and receive· a wound, which, though itself not mortal, hastens or accelerates death, the person inflicting the wound will be accountable for his death. Every man (woman), from the time of his birth, is hastening to his death, and in a sense he is born and lives with mortal infirmities or wounds, or diseases, or' by whatever name you choose to call his deteriorating vitality; for the workings of the laws of nature are inevitably carrying or hastening him to his death, and no murder does more than to hasten his death or bring it about sooner than the laws of nature would themselves have brought it about if there had been no interference by criminal agency. *Wells* v. *State,* supra; People v. Ah Fat, 48 Cal. 61; Tidwell v. State, 70 Ala. 33; State v. Mathews, 38 La. Ann. 795; Winter v. State, 123 Ala. 1 (26 So. 949); People v. Moan, 65 Cal. 532 (4 Pac. 545); Baker v. State, 30 Fla. 41 (11 So. 492); State v. Castello, 62 Iowa, 404 (17 N. W. 605); State v. Smith, 73 Iowa, 32 (34 N. W. 597); State v. O'Brien, 81 Iowa, 88 (46 N. W. 752); Com. v. Fox, supra; Griffin v. State, 40 Tex. Cr. 312 (50 S. W. 366, 76 Am. St. R. 718); Harvey v. State, 40 Ind. 516; Hollywood v. State, 19 Wyo. 493 (120 Pac. 471, 122 Pac. 588, Ann. Cas. 1913E, 218); Gardner v. State, 44 Tex. Cr. 572 (73 S. W. 13); Cunningham v. People, 195 Ill. 550 (63 N. E. 517). In such case death is not *ex visitatione Dei,* for the wound hastens death, and the offender. can not apportion his wrong. So, too, where one inflicts upon another a wound, not mortal, but which through other natural causes operates to cause death, such as blood poisoning resulting from a cut, the person so inflicting the wound will be accountable for his death. *Clements* v. *State,* 141 *Ga.* 667 (4) (81 S. E.

1117), and cit. However, if one inflicts upon another a wound, itself not fatal, and thereafter such other be attacked by a disease not resulting from such wound, from which disease death results, the person so inflicting such wound is not responsible for the death, even though the wound inflicted rendered the deceased less able to resist the effects of the disease. Livingston v. Com., 55 Va. (14 Gratt.) 592. Thus: "To hold a person criminally responsible for a homicide, his act must have been the proximate cause of the death as distinguished from the cause of a condition affording an opportunity for the compassing of the death by some other unconnected agency." Wharton on Homicide, 31, § 28.

While, if the defendant actually knew or had reason to know that his wife was ill, and was thereby put in such a weak and feeble condition that his attack would endanger her life, or hasten her death, the jury would have been authorized to find him guilty of murder, and while under the evidence the defendant might also have been convicted of involuntary manslaughter, we are unable to hold that a verdict of voluntary manslaughter was supported. This is true as to both counts of the indictment. As to whether the evidence was sufficient to make out *any* offense under the charge that the defendant failed and refused to call a doctor for his wife, the following cases should be consulted: Bradley v. State, 79 Fla. 651 (84 So. 677, 10 A. L. R. 1129); Stehr v. State, 92 Neb. 755 (139 N. W. 676, 45 L. R. A. (N. S.) 559, Ann. Cas. 1914A, 573); State v. Barnes, 141 Tenn. 469 (212 S. W. 100); Com. v. Breth, 44 Pa. Co. Ct. 56; State v. Staples, 126 Minn. 396 (148 N. W. 283); Westrup v. Com., 123 Ky. 95 (93 S. W. 646, 6 L. R. A. (N. S.) 685, 124 Am. St. R. 316). See note in 10 A. L. R. 1137. It is not necessary at this time to determine this question. "Manslaughter is the unlawful killing of a human creature, without malice, either express or implied, and without any mixture of deliberation whatever, which may be voluntary, upon a sudden heat of passion, or involuntary, in the commission of an unlawful act, or a lawful act without due caution and circumspection." Code, § 26-1006. "In all cases of voluntary manslaughter, there must be some actual assault upon the person killing, or an attempt by the person killed to commit a serious personal injury on the person killing, or other equivalent circumstances to justify the excitement of passion, and to exclude all idea of deliberation or malice, either

express or implied. Provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder. The killing must be the result of that sudden, violent impulse of passion supposed to be irresistible; for if there should have been an interval between the assault or provocation given and the homicide, of which the jury in all cases shall be the judges, sufficient for the voice of reason and humanity to be heard, the killing shall be attributed to deliberate revenge, and be punished as murder." § 26-1007. We think that it is apparent that the evidence fails to make out a case of voluntary manslaughter. Under the evidence it is murder, involuntary manslaughter, or acquittal. Therefore the conviction of voluntary manslaughter can not be upheld; and we think for this reason he is entitled to a new trial.

■ In the motion for new trial complaint is made of the following charge of the court, as containing an expression or intimation of opinion: "If *the homicide* was unlawful, and if there was no intent to kill and no malice, and it was without any mixture of deliberation whatever, but was in the commission of an unlawful act, the offense would be involuntary manslaughter." This excerpt from the judge's charge seems to be in the language of Cann on Requests to Charge, § 712. The State's case was of course based upon the theory of homicide. The defendant offered evidence which tended to show that his wife died from natural causes. Whether or not there was a homicide or killing in the present case was one of the principal issues, and it would be perhaps better if the judge would avoid the use of this expression as above quoted. We are reversing the judgment on other grounds, and further comment on this exception is not deemed necessary. "The judge will doubtless so qualify any such expressions on the next trial as to place them beyond the possibility of criticism." *Patterson* v. *State,* 181 *Ga.* 698, 702 (184 S. E. 309).

■ The rulings announced in headnote 4 do not require elaboration.

*Judgment reversed. Broyles, C. J., and Guerry, J., concur.*