[No. 2312–3.   Division Three.   June 20, 1978.]

LEAVY, TABER, SCHULTZ & BERGDAHL, *Appellant,* v.
METROPOLITAN LIFE INSURANCE COMPANY,
ET AL, *Respondents.*

*Leavy, Taber, Schultz, Bergdahl & Sweeney* and *Crane Bergdahl,* for appellant.

*Yancey Reser, Charles Snyder,* and *Albert J. Golden,* for respondents.

ROE, J.—John Crudup was married twice. His first wife was Arletha, who divorced him; his second was Zadie, who killed him. At his death he had a policy with Metropolitan Life Insurance Company naming Zadie as beneficiary. His first wife, and his second wife's assignee, as well as his children, seek the proceeds thereof.

The divorce decree from Arletha ordered John to pay all community indebtedness, excluding only the mortgage on the house awarded to Arletha. John was further required to maintain in force all life insurance policies, assuring the payment of unpaid mortgages on his death. The house awarded to Arletha was subject to both a purchase money mortgage and a mortgage for a Small Business Administration loan made to John.

Arletha claims under the decree and desires that the purchase money mortgage on the house be paid out of the policy proceeds. She does not claim, nor could she, that John was required to pay that mortgage during his lifetime, since the decree actually provided the opposite. That was the one community debt he did not have to pay.

■ The crucial question is to determine what the court intended when it ordered the defendant to maintain mortgage insurance policies "assuring the payment of unpaid mortgages upon his death." Interpretation of the divorce court's judgment is not a question of fact, but is a question of law for this court. In *Callan v. Callan,* 2 Wn. App. 446, 448–49, 468 P.2d 456 (1970), the court stated:

> The interpretation or construction of findings, conclusions and judgments presents a question of law for the court. . . . If the judgment is unambiguous, there is no

room for construction. . . . If, however, the judgment is ambiguous, then the court seeks to ascertain the intention of the court entering the judgment or decree. The general rules of construction applicable to statutes, contracts and other writings are used with respect to findings, conclusions and judgment. . . . These rules include the rule that the intention of the court is to be determined from all parts of the instrument, and that the judgment must be read in its entirety and must be construed as a whole so as to give effect to every word and part, if possible. . . . The authorities . . . refer to two canons of construction, here particularly pertinent (1) that the court is not confined to ascertaining the meaning of a single word or phrase without regard to the entire judgment, and, if necessary, the judgment roll, and (2) that provisions in a judgment that are seemingly inconsistent will be harmonized if possible. It is not to be assumed that a court intended to enter a judgment with contradictory provisions and thus impair the legal operation and effect of so formal a document.

(Citations omitted.) Considering the decree in its entirety, it is clear that Arletha was awarded the house subject to the mortgage, which she was to pay. It is also clear that, despite any divorce decree, the house was still subject to the mortgage securing the SBA loan. The plain interpretation is that the provision for the insurance policy was to assure that the house would never be subjected to foreclosure by the SBA in the event John should default on that obligation.

Arletha argues that the decree provision concerning the insurance policy was a property division giving her the right to have her mortgage paid off in the event of John's death. We do not believe that the court would distribute such a right to Arletha, and yet not require John to pay the mortgage himself. When the court stated that its purpose was to assure payment of unpaid mortgages upon his death, that must have been in reference to mortgages which he himself was obligated to pay. Arletha cites no authority which would explain why the divorce decree would mean anything else.

The only reason for requiring John Crudup to maintain mortgage insurance on his life would be to assure Arletha that his death would not leave her exposed to claims of any mortgage he might have left unpaid. If he had outlived his and Arletha's mortgage payments, she would have received nothing more than she received under the decree. She should not get a windfall by his death. No language in the decree ordered payment of the balance due on her mortgage in the event he died. In fact, the decree specifically relieved him of any duty to pay her mortgage. The trial court's judgment denying her claim is correct.

A more difficult question is presented in interpreting the effect of RCW 11.84., the slayer's act.

No slayer shall acquire any property or benefit as a result of the death of the decedent. RCW 11.84.020. A slayer is one who participates in the *"wilful* and unlawful killing" of another person. (Italics ours.) RCW 11.84.010(1). Clearly Zadie Crudup participated in an unlawful killing. She was charged with second–degree murder but was found guilty of the lesser–included offense of manslaughter, which was affirmed on appeal, *State v. Crudup,* 11 Wn. App. 583, 524 P.2d 479, *review denied,* 84 Wn.2d 1012 (1974). But did she "wilfully" kill her husband? The word "intent" is not used in the slayer's act.

The trial court found a willful killing; thus, plaintiffs to whom Zadie had assigned the proceeds were foreclosed from recovery, and John's children received the proceeds through his estate.

▪ The record of defendant's criminal trial and conviction for the killing of the decedent is admissible in evidence against a claimant of property in any civil action arising under the slayer's act. RCW 11.84.130. While the result in the prior criminal case is relevant, it is not conclusive. The lower court by stipulation read the verbatim report of the proceedings in the criminal trial and concluded that her act had been willful.

The only reported Washington case decided under this statute is *New York Life Ins. Co. v. Jones,* 86 Wn.2d 44,

541 P.2d 989 (1975), wherein a wife who had killed her husband pleaded guilty to second–degree felony murder arising out of second–degree assault. Since second–degree felony murder does not require proof of intent to kill, then the wife's guilty plea was held not to have been an admission that she did willfully kill her husband.

This is a civil case and proof need only be by the preponderance of the evidence. Conceivably a person may be acquitted because guilt had not been proven beyond a reasonable doubt, or conceivably a person may not even be tried and could still be shown in a civil action to have been a willful slayer. A criminal conviction is not a sine qua non to application of the slayer's act. *See Young v. Seattle,* 25 Wn.2d 888, 172 P.2d 222 (1946).

There was ample testimony of one Dexter Lincoln, who was an eyewitness to the slaying, to support the second–degree murder charge. Lincoln had been at decedent's home helping him estimate a bid for a bricklaying contract. Mr. Lincoln, Mr. Crudup, and Zadie Crudup were all drinking. Lincoln testified:

> I don't know how much time elapsed from the time we got back in the house and this happened—I seen Zadie standing out in front of me with a gun in her hand, and I didn't know—I couldn't figure what in the world was going on. I asked what she was going to do with the gun and she said, "*I am going to kill that son of a bitch,*" so I looked around. . . . I said, "Wait a minute, life is too short or something like this." I said, "Let's talk it over. This is not right." So I asked her to give me the gun. I was reaching out for it and when John walked in—the lighting in the house is not right, not an overhead light. . . . A few seconds after I was asking her for the gun, a shot went off and the next thing I remember, I seen John laying on the floor over there in the hallway. . . . I walked over, I leaned over, she said she killed him, "He is dead." I said, "I can't believe it." I was walking over, looking, and I still couldn't see evidence looking at him that he had been shot.

(Italics ours.)

Zadie Crudup's answer was that Lincoln was drunk (he passed out after the event), was in no position to hear or see the events, and did not remember this until many months after the police first interviewed him. She claims that in fact he was totally impeached.

Zadie Crudup's defense was that John had come out with the gun first, that they had struggled over it, and that it had ended up in her hand as the fatal shot was fired. She said that they had been drinking and had had a dispute, but not a fight, that evening because he was blaming her for some of his troubles with the Internal Revenue Service. She said John was telling her to get out of the house. At first she refused to leave; then she told him if that was the way he wanted it, she would leave. She said he stood in the door holding the gun and blocking her exit to the front. They started tussling, and she grabbed him when she realized he had a weapon. She was scared. They wrestled and a shot went off while her husband had the gun. The scuffle continued, and a short time later there was a second shot. She was trying to get out the door and to keep the gun away from herself. Mr. Lincoln, who was there, was kind of pulling on John Crudup's arm and Mrs. Crudup stated that she was trying to push the gun away from herself. And "that is all I can remember except that it just went off and all of a sudden there was no more struggle and then I ran out the door." When the second shot went off, she was not separated from her husband, nor had she been able to get free of him. She didn't know that she had control of the gun. When the second shot went off, however, the weapon was in her hand. Immediately after the shooting Zadie Crudup went next door and told her neighbor, Lois Norris, that she had "killed" John.

Powder residue was found on the hands of both parties. This could have arisen from each having fired the gun or each having a hand on the gun, or something similar, when it was fired.

At the criminal trial and on its appeal, Zadie Crudup strenuously argued that the manslaughter instruction was

error, that the killing was either intentional second–degree murder or no crime, *i.e.,* self–defense or excusable conduct. We stated in *State v. Crudup, supra* at 590–91, affirming the manslaughter conviction:

> If there is no evidence to support a verdict of manslaughter, the court should not instruct the jury on manslaughter. . . . Here, there is evidence of a struggle between the defendant and decedent; there is conflicting evidence as to which party produced the gun, and which party was, in fact, the aggressor. With this conflicting evidence it was proper to place the question of manslaughter before the jury. The jury could properly find either that the defendant was an aggressor in the action and shot the decedent with intent to kill; or alternatively, but not necessarily the only alternative under the evidence, that the defendant was acting in self–defense but used more force than was necessary.

(Citations omitted.)

▇ Now, in this civil case, plaintiffs contend, since Zadie Crudup was found guilty of manslaughter, that that precludes a finding that she had willfully killed John Crudup. Plaintiffs now contend that the manslaughter conviction, which they strenuously objected to earlier and which they now embrace, mandates a holding in their favor that no substantial evidence supports the trial court's finding of a willful slaying. The quoted portion of our prior opinion clearly finds evidence of intent. John Crudup's estate argues substantial evidence clearly supports the trial court's conclusion, hence, that we are bound by the rationale of *Thorndike v. Hesperian Orchards, Inc.,* 54 Wn.2d 570, 343 P.2d 183 (1959). The substantial evidence test does not apply to this case. Since the trial court made its decision on this issue solely on the basis of the record from the prior trial, this case does not fall within the rule that an appellate court will not substitute its judgment for that of the trial court with regard to a disputed fact. *In re Estate of Nelson,* 85 Wn.2d 602, 537 P.2d 765 (1975); *In re Schmitz,* 44 Wn.2d 429, 268 P.2d 436 (1954); *Holt Mfg. Co. v. Thomas,* 69 Wash. 488, 125 P. 772 (1912). Since the trial

court's determination did not involve passing on the credibility or competency of witnesses, the appellate court considered itself in these cases to be in as good a position as the trial court to resolve questions of fact.

■ In *State v. Hopkins,* 147 Wash. 198, 265 P. 481 (1928), the defendant was charged with manslaughter in having entrusted her car to an intoxicated man. He collided with another car, causing the death of a little girl. In upholding the conviction, the court stated at page 205–06:

> It is now the settled law in this state that intent to cause the death of another is not an element in the crime of manslaughter. . . . This plainly does not mean that intent to do an unlawful or grossly negligent act resulting in the unintentional death of another, is not an element of the crime of manslaughter.

(Citations omitted.) Thus, willfulness can be present in a conviction for manslaughter, as opposed to a purely accidental death, possibly arising from, *e.g.,* an automobile accident. The trial judge, in an oral opinion, stated that the first thing he did was go to the record to see whether there was a question of negligence on the part of the defendant justifying the conviction under the negligence aspect of the manslaughter statute. Having found none, he looked again to see whether the act of killing was willful. He determined that the jury must have convicted the defendant because the jury felt there was willful manslaughter not amounting to second–degree murder. The court found that the killing had been willful and consequently that Zadie Crudup and her assignees were disqualified under the statute from receiving any of the insurance proceeds.

The evidence of willfullness is the testimony of Dexter Lincoln, an eyewitness, albeit possibly a hazy one, and one who had been drinking. On the other hand, Zadie Crudup does not give any definite, firm statement as to how the killing occurred. She was unable to explain the fact that she had the gun in her hand. Obviously the jury did not believe her claim that the killing was accidental, or justifiable, or in

self–defense; otherwise, it would have acquitted her. The only positive disinterested testimony is Mr. Lincoln's.

Considering that the slayer's act is not penal and is to be construed broadly to effect this state's policy that no person shall be allowed to profit by his own wrong, RCW 11.84.900, we find the reasoning of the trial court persuasive. The jury did not believe Zadie Crudup. There was only one disinterested witness. In this civil action, determined only by the preponderance of the evidence, we find a willful act in the shooting.

The judgment of the trial court is affirmed.

MUNSON, C.J., and GREEN, J., concur.