668 P.2d 110

In the Matter of the ESTATE OF
Charles Edgar ELIASEN, aka
Edgar Eliasen, Deceased.

Lucille ELIASEN, the widow of Charles
Edgar Eliasen, Deceased,
Appellant-Cross-Respondent,

v.

L.D. FITZGERALD, Personal Representa-
tive of the Estate of Charles Edgar Elia-
sen, Deceased, Respondent-Cross-Appel-
lant.

No. 13651.

Supreme Court of Idaho.

June 23, 1983.

Rehearing Denied Sept. 8, 1983.

Lloyd J. Webb, Twin Falls, for appellant-cross-respondent.

R.M. Whittier, Pocatello, for respondent-cross-appellant.

SHEPARD, Justice.

This is an appeal from a decision of the district court which on appeal affirmed a decision of a magistrate court in a probate proceeding. The principal questions presented are the status at the time of decedent's death of certain property as being community or separate in nature and the applicability of Idaho's slayer statute, I.C. § 15–2–803, to this widow, who shot her husband, the decedent. We affirm in part and reverse in part.

The decedent, Charles Edgar Eliasen, a/k/a Edgar Eliasen, was 70 years old at the time of his death in November 1974. Decedent for many years had been in the ranching and cattle business. For some years prior to 1966, the decedent and his brothers, Ronald and Lars, had owned 5,091 acres of property in Rockland, Idaho with some cattle thereon. In June of 1966, the brothers sold the property for the sum of $165,000, which was to be paid $40,000 down, and the remaining balance of $125,-000 in annual installments of $12,000 over a period of 16 years, which sum included interest on the unpaid balance at five per cent. The record is unclear as to what portion of the moneys went to each of the three brothers. The decedent and his brother Ronald took their moneys from the sale of the Rockland property and in 1966 purchased a small 120 acre farm in the area of Marsh Valley, Idaho. Each brother contributed $5,000 toward the down payment, but the Marsh Valley farm was obtained in the decedent's name alone pursuant to an arrangement between the brothers that Ronald would not obtain any ownership interest but would rather receive a right to live on that ranch for his life. The brothers together made annual payments of $5,000 on the Marsh Valley ranch until Ronald died in 1967, following which time the payments were made by decedent. The yearly payments on the Marsh Valley property were made with moneys received from the sales contract on the Rockland ranch, together with moneys received by the decedent from cattle sales. In June 1967, appellant Lucille Eliasen began living with the decedent on the Marsh Valley property. In February 1968, the decedent and Lucille had a child, Charles Edgar Eliasen II. The decedent and Lucille Eliasen were ceremonially married in June 1970.

In July 1973, the decedent Edgar Eliasen sold the Marsh Valley property for the sum of $20,000 in cash, and whether he carried a contract for the balance or had the buyer assume the loan is not clear from the record. With the moneys received from that sale, decedent paid some community expenses, bought two vehicles for himself, and bought a mobile home (a down payment of $5,100 and a five-year contract for the remaining balance of $13,700). Decedent also bought appellant Lucille Eliasen a car for approximately $3,000 and gave her $5,000 in cash, which he asserted represented any community interest she might have had in the real property. The decedent took the remainder of the moneys from the sale of the Marsh Valley property, added to its moneys from his own bank account, and purchased a farm in Minidoka County known as the Acequia ranch. The down payment on the Acequia ranch was $26,000, with the remaining balance of approximately $26,000 to be paid in annual installments of $2,500. Only the annual installment for 1974 was paid by the decedent prior to his death.

During the course of their relationship, the decedent and Lucille Eliasen segregated their moneys in separate bank accounts. Lucille owned real property from which she collected rent, and that money was placed in her separate bank account, as were the earnings from her employment. The decedent maintained two bank accounts in his name, into which he deposited the receipts from the Rockland sales contract, the proceeds from the sale of cattle, and the income from the ranch. Lucille had several children from a prior marriage who were also living with and being supported by the decedent and Lucille at the ranch.

In 1974, the decedent and Lucille were having marital difficulties and Lucille moved out of the Acequia residence, following which the decedent filed for a divorce in July 1974. In September 1974, the decedent was suffering from stomach cancer and was receiving chemotherapy. Lucille came to the ranch and shot the decedent, following which he was hospitalized for the abdominal wound. Although the chemotherapy had been effective in inhibiting the stomach cancer, it interfered with the healing of the abdominal wound and had to be discontinued for some time. Following the death of decedent on November 28, 1974, Lucille Eliasen was charged with and pled guilty to assault with a deadly weapon, for

which offense she was sentenced to and served time in the Idaho State Penitentiary.

The decedent died testate, leaving his property to the son of the marriage, Charles Edgar Eliasen II, and to Terry Mac Chase, one of Lucille's children by her prior marriage. The widow, Lucille Eliasen, was expressly excluded from the will. When a probate petition was filed in December 1974, appellant Lucille Eliasen filed objections, and from 1974 to the present time, the parties have both filed numerous petitions, including several requests by the widow for the setting aside of homestead and exempt property and for the removal of the personal representative.

During trial at the magistrate court level, evidence was presented, part of which was the deposition of the decedent, taken in the hospital following the shooting and conducted in the presence of counsel for each party and of the trial judge. Following trial, the magistrate entered a memorandum opinion, findings of fact, and conclusions of law holding that all of the property held in decedent's name was separate in character and that the slayer statute, I.C. § 15–2–803, was inapplicable. Thereafter the widow petitioned the court for the setting aside of exempt property and homestead and a family allowance. That petition was granted, but the family allowance was limited to $6,000. The magistrate also allowed attorney's fees to the widow and to the personal representative.

From those orders of the magistrate court, appeals were perfected to the district court which involved the characterization of the property, the approval of the accounting, the award of attorney's fees, and the order limiting the family allowance to $6,000. The district court affirmed the magistrate's rulings that all the property was the separate property of the decedent and that the slayer statute was not applicable. The district court reversed the magistrate's holding that the family allowance was limited to $6,000 and also allowed attorney's fees to the widow. On appeal to this Court, appellant Lucille Eliasen asserts error in the characterization of the proper-

ty, and the respondent personal representative cross-appeals from the ruling of the inapplicability of the slayer statute. Although some 13 issues are enumerated upon appeal, we have consolidated or restricted them to the following:

(1) Was the trial court correct in its characterization of the property as being separate?

(2) Did the trial court err in allowing into evidence the deposition of the decedent?

(3) Was the trial court correct in allowing the award of attorney's fees to the personal representative and to the widow?

(4) Is the slayer's statute, I.C. § 15–2–803, applicable in the instant case?

## I. CHARACTERIZATION OF THE PROPERTY.

The trial court concluded that all the property listed in the decedent's estate at the time of his death was his separate property. That conclusion was based, at least in part, on the court's finding that the decedent and the widow were ceremonially married on June 22, 1970 and had prior to that date lived together unmarried. Appellant widow contends that the finding that the state of marriage did not exist until 1970 was erroneous and that, since the conclusion of separate property was based thereon, that conclusion was also error. We agree with the appellant that the finding as to the date of the marriage was erroneous and that the decedent and the widow had been husband and wife since June 1967 by reason of a common law marriage, but nevertheless we affirm the holding of the trial court that the property in question was the decedent's separate property.

In *Metropolitan Life Ins. Co. v. Johnson*, 103 Idaho 122, 645 P.2d 356 (1982), we noted that the doctrine of common law marriage was preserved in Idaho by I.C. § 32–301, and that the manner in which a marriage can be proved is outlined by I.C. § 32–203: "Consent to and subsequent consummation of marriage may be manifested in any form, and may be proved under the same

238

general rules of evidence as facts in other cases." The Court stated:

"Under I.C. § 32–201, a marriage which is not solemnized requires the mutual consent of competent parties, followed by a mutual assumption of marital rights, duties or obligations. *Hamby v. Simplot Company,* 94 Idaho 794, 498 P.2d 1267 (1972).

"It is established that the consent required by I.C. § 32–201 must be *given* when the parties enter into the contractual responsibilities of marriage. *In re Gholson's Estate,* 83 Idaho 270, 361 P.2d 791 (1961). That consent need not be manifested in any particular manner and no magic words are necessary but rather consent may be express or it may be implied from the parties' acts and conduct. I.C. § 32–203.

\* \* \* \* \* \*

. "The prior decisions of this Court make clear that when a couple cohabit, assume the rights, duties and responsibilities of marriage, and hold themselves out as being married, a presumption of marriage arises which, if disputed, must be overcome by clear and positive evidence." *Metropolitan Life Ins. Co., supra,* 103 Idaho at 127, 645 P.2d at 361. *Accord In re Estate of Brock,* 94 Idaho 111, 482 P.2d 86 (1971); *Mauldin v. Sunshine Mining Co.,* 61 Idaho 9, 97 P.2d 608 (1939).

■ Here, the testimony indicated that the parties lived together, assumed marital rights and duties, including the conception and birth of a son, and that they held themselves out as husband and wife, beginning in June 1967. Although the testimony that the parties held themselves out as husband and wife was that of the widow's alone, we held in *Mauldin v. Sunshine Mining Co.,* 61 Idaho 9, 97 P.2d 608 (1939), and reaffirmed in *Metropolitan Life, supra,* 103 Idaho at 127, 645 P.2d at 361, that, "[s]ince in most instances, questions as to the existence of such a marriage will arise only after death, a marriage may be proven by the testimony of one of the parties."

The only evidence which appears to support the trial court's finding that the mar-

riage relationship began in June of 1970 is the fact of the ceremonial marriage at that date. The factors supporting the widow's claim of common law marriage are that the parties lived together on the ranch; that they conceived a child, which was born to them in February 1968; that the decedent held Lucille out as his wife; that they filled out social security papers, stating that they had been living together as man and wife since 1967; that the testimony of both the decedent and Lucille was that the marriage took place in 1968; and finally that the complaint for declaratory judgment stated, "That a number of years prior to the death of Charles Edgar Eliasen he lived with Lucille Eliasen in a Common Law state, which was later solemnized." We hold that sufficient evidence meeting the evidentiary requirements raised the presumption of marriage and thereafter the burden shifted to the estate to disprove the validity of the asserted common law marriage. The subsequent solemnization was insufficient to meet the clear and positive proof standard. Hence, the finding of the trial court is not supported by substantial evidence and is reversed, and we hold that a common law marriage existed as of June 1967.

Turning to the trial court's characterization of the property, we note at the outset that such is within the discretion of the trial court and unless the record demonstrates an abuse of that discretion, the award of the trial court will not be disturbed. *Koontz v. Koontz,* 101 Idaho 51, 607 P.2d 1325 (1980); *Wyatt v. Wyatt,* 95 Idaho 391, 509 P.2d 1312 (1973); *Cargill v. Hancock,* 92 Idaho 460, 444 P.2d 421 (1968).

Here the trial court found the following facts: that, at the date of the ceremonial marriage, each party had separate assets, the decedent owning a farm and some cattle; that after the ceremonial marriage, the decedent made two real property transfers and, upon death, owned a small farm, farm machinery, and no cattle; that the decedent had less property at death than he had at the date of marriage; that purchases made by the decedent during coverture were made from separate property sold by dece-

dent during coverture; and that during the marriage, the parties maintained separate bank accounts. The court then ruled, as a matter of law, that the presumption of community property applied only where the source of specific property could not be traced, and that where each spouse's property is traceable, commingling does not convert it to community; that rents and profits of separate property are community only to the extent that they are net rents and profits; and that all of the property in the decedent's estate was separate property at the time of his death.

Viewing the evidence most favorably in support of the decision of the trial court, it reveals the following. At the time of the marriage the decedent was an elderly man who was collecting social security and who, during the years prior to his death, had reduced the size of his ranching operations significantly, turning the management of the farm over to his younger relatives. His main source of income was the sale and purchase of cattle. Any profit from the farm itself had been spent by the parties and none of the farm income remained at the time of his death. The decedent entered the marriage with more extensive assets than he possessed at the time of his death. The decedent took his share of the moneys from the Rockland property owned by him and his brothers prior to his marriage and applied it to the purchase of progressively smaller farms, first at Marsh Valley and then at Acequia. He deposited the funds received from his separate real estate contracts into bank accounts, from which he kept up the payments on the Marsh Valley ranch and later the Acequia ranch.

Appellant widow argues that the interest from the moneys in the bank accounts was community, and that by commingling the interest with the principal and not keeping accurate records of moneys used, the decedent rendered the entire accounts community assets. She contends that the estate has not proved the separate character of any of the assets purchased after the date of the marriage.

It is true that a presumption exists that property acquired during marriage is community, *Stanger v. Stanger,* 98 Idaho 725, 571 P.2d 1126 (1977); *Simplot v. Simplot,* 96 Idaho 239, 526 P.2d 844 (1974), and that the party asserting the separate nature of such property has the burden of so proving, *Cook v. Cook,* 102 Idaho 651, 637 P.2d 799 (1981). Here, the trial court determined that such burden of proof had been met. There was substantial evidence that each of the parties entered the marriage relationship with separate property, that they intended to retain the separate nature of that property, that they kept separate bank accounts, into which each deposited moneys, and that during the course of the marriage neither claimed any interest in the other's bank account or attempted to or did withdraw any moneys from the other's bank account. Virtually all of the property in question here was purchased with moneys from the decedent's separate bank accounts.

We hold that the property of the decedent's estate was his separate property by the nature of its source. Admittedly, it arose from the Rockland ranch contract which was vested, obligatory, and intact before the existence of any marriage relationship. The decedent had, prior to marriage, the right to a liquidated sum annually for a fixed term of years. That contractual income may be likened to an increase in separate stock, *Simplot v. Simplot,* 96 Idaho 239, 526 P.2d 844 (1974), the appreciated value of an automobile, *Gapsch v. Gapsch,* 76 Idaho 44, 277 P.2d 278 (1954), or a determined share in a cattle herd, *Ripatti v. Ripatti,* 94 Idaho 581, 494 P.2d 1025 (1972). Where enhancement of the value of a separate property asset is not attributable to community effort or to rents and profits of the asset, it is separate property. *Mifflin v. Mifflin,* 97 Idaho 895, 556 P.2d 854 (1976); *Speer v. Quinlan,* 96 Idaho 119, 525 P.2d 314 (1974). In the instant case, community labor, industry, or effort is not shown to have produced any community interest in the bank accounts of the decedent. The trial court found that community expenses had

more than consumed any community assets, and therefore the remainder of the property in the decedent's estate was separate property. *Houska v. Houska,* 95 Idaho 568, 512 P.2d 1317 (1973); *Evans v. Evans,* 92 Idaho 911, 453 P.2d 560 (1969). We find no error.

As to the cattle, this court held in *Ripatti v. Ripatti, supra,* that where a cattle herd is built up and increased through the combined labor and industry of the family members, the community is entitled to claim an interest in that herd. However, when the herd is not increased but merely maintained, and where the herd size stays at the same level, the herd is separate in character. *Evans v. Evans,* 92 Idaho 911, 453 P.2d 560 (1969). Here, the evidence indicates no increase in the size of the cattle herd, but rather in fact indicates that the cattle herd had diminished to practically nothing at the death of the decedent. The trial court determined that there was no community income from the herd, with the possible exception of interest accrued on moneys received from the sale, which moneys we have determined were more than exhausted by community expenses.

As to the farming equipment owned by the decedent prior to marriage, to the extent it still exists as a part of his estate, it is readily identifiable as pre-nuptial assets and is his separate property. We note also that the widow has collected substantial homestead and family allowance. It is clear that, even if the widow were entitled to some minor interest in the property acquired by the decedent during the time of the marriage, she has been more than adequately compensated therefor.

## II. DECEDENT'S DEPOSITION.

Appellant widow contends that the admission at trial of Edgar Eliasen's deposition was error. We disagree. The deposition of the decedent was taken in his hospital room in the presence of counsel and the trial judge. Decedent was dead at the time of the trial and pursuant to Rule 32(a), his deposition could be used by "any party for any purpose." I.R.C.P. 32(a), identical to F.R.C.P., Rule 32(a), provides:

"[W]hen an action in any court of the United States or of any state has been dismissed and another action involving the same subject matter is afterward brought between the same parties or their representatives or successors in interest, all depositions lawfully taken and duly filed in the former action may be used in the latter as if originally taken therefor."

The subject matter requirement of Rule 32(a) does not demand *precisely* the same subject matter but only that the issues be *substantially* identical. *Rule v. International Ass'n of Bridge, Etc., Workers,* 568 F.2d 558 (8th Cir.1978); *Alamo v. Pueblo International Inc.,* 58 F.R.D. 193 (D.C. Puerto Rico 1972); *Fullerform Continuous Pipe Corp. v. American Pipe and Constr. Co.,* 44 F.R.D. 453 (D.C.Ariz.1968).

Although decedent's deposition was taken for his pending divorce action, he died before that action came to trial. The issue involved in the divorce case, aside from the dissolution of the marriage, was the characterization and ultimate distribution of the property. Likewise in this probate proceeding, the issue is the characterization and distribution of the property. The parties are the same, being the personal representative for the decedent and the widow herself.

The determination of the admissibility of evidence is discretionary with the trial court and will not be overturned absent an abuse of discretion. *Jensen v. Seigel Mobile Homes Group,* 105 Idaho 189, 668 P.2d 65 (1983); *Curiel v. Mingo,* 100 Idaho 303, 597 P.2d 26 (1979). As the rule applies to statements of persons since deceased, *see Silver Syndicate, Inc. v. Sunshine Mining Co.,* 101 Idaho 226, 611 P.2d 1011 (1979).

## III. GRANTING OF ATTORNEY'S FEES.

Appellant widow appeals from the decision of the district court allowing reasonable attorney's fees to the personal representative. The magistrate allowed to the

personal representative the attorney's fees which he incurred as a result of the numerous proceedings in the magistrate court. On appeal, the district court affirmed the award of attorney's fees but modified it to the effect that:

"there shall be excluded from the fee allowed, any portion attributed to the efforts of the Personal Representative to defeat the family allowance, the homestead allowance or the exempt property. Finally, it is the opinion of this Court that there should be excluded from the attorney's fees allowed any sum which may be attributed to the resistance of the first Personal Representative to his removal."

■ I.C. § 15–3–720 provides that a personal representative who "defends or prosecutes any proceeding in good faith, whether successful or not ... is entitled to receive from the estate his necessary expenses and disbursements including reasonable attorney's fees incurred." The services rendered must benefit the estate and cannot be incurred to protect personal interests. *In Re Estate of Sauter,* 615 P.2d 875 (Mont.1980); *Matter of Estate of Stephens,* 117 Ariz. 579, 574 P.2d 67 (Ariz.App.1978).

■ The only basis for the district court's denial or apportioning of the attorney's fees sought by the personal representative was evidently its belief that the contesting of the widow's rights to family allowance, homestead and exempt property was not brought in good faith. *See* I.C. § 15–3–720. The district court also refused to affirm the magistrate's allowance of attorney's fees incurred by the personal representative in his efforts to remain the personal representative. We find no abuse of discretion in the rulings of the magistrate court and hence reverse the decision of the district court overturning the magistrate's allowance of those attorney's fees.

■ The respondent personal representative asserts that attorney's fees should not have been allowed to the widow on her appeal to the district court. I.C. § 12–121, in effect at the time this action was filed, specifically provides for attorney's fees to the prevailing party at the discretion of the trial court. Since the district court sat in an appellate capacity, the award of attorney's fees is to be governed by the standards set forth in *Minich v. Gem State Developers,* 99 Idaho 911, 591 P.2d 1078 (1979), holding that in normal circumstances, attorney's fees will only be awarded when the court is left with the abiding belief that the appeal was brought, pursued or defended frivolously, unreasonably or without foundation. That rule is applicable to probate proceedings. *Matter of Estate of Bowman,* 101 Idaho 131, 609 P.2d 663 (1980). Apparently, the district court, in awarding attorney's fees on appeal to the widow, was of the opinion that the personal representative acted in bad faith, unreasonably and without foundation when it contested on appeal the widow's claims for family allowance, allocation of exempt property, and homestead. We reverse the district court's award of attorney's fees to the widow. In our view, the widow was not entitled to such statutory rights as have been provided for the benefit of surviving spouses because, as we hold *infra,* the slayer's statute is applicable in this case. Thus, the widow's claims were properly contested by the personal representative.

## IV. APPLICABILITY OF THE SLAYER'S STATUTE.

In *Anstine v. Hawkins,* 92 Idaho 561, 447 P.2d 677 (1968), this Court held that a wife who had been convicted of voluntary manslaughter of her husband was entitled to inherit her husband's intestate estate because our statutes of descent and distribution did not at that time provide for exclusion of such an heir. In 1971, the legislature, apparently in response to the *Anstine* ruling, enacted I.C. § 15–2–803, which provides in pertinent part:

"Effect of homicide on distribution at death.—(a)(1) 'Slayer' shall mean any person who participates, either as principal or as an accessory before the fact, in the wilful and unlawful killing of any other person.

\*　　\*　　\*　　\*　　\*　　\*

(b) No slayer shall in any way acquire any property or receive any benefit as a result of the death of the decedent, but such property shall pass as provided in the sections following:

(c) The slayer shall be deemed to have predeceased the decedent as to property which would have passed from the decedent or his estate to the slayer under the statutes of descent and distribution *or have been acquired by statutory right as surviving spouse* or under any agreement made with the decedent." (Emphasis added.)

The instant case is the first presented to this Court involving the applicability of I.C. § 15–2–803, and this case presents particularly difficult questions in light of its unusual facts. We conclude that the failure of the lower court to apply the slayer statute in the instant case was erroneous and is reversed.

The material facts are essentially undisputed. Throughout his years, the decedent had led an active life until the date of his death at the age of 70. In the spring of 1974, the decedent was diagnosed as having an adenocarcinoma of the stomach and he began chemotherapy treatment. Chemotherapy involves the injection of toxic materials into the body to destroy cancerous cells, which otherwise divide rapidly as compared to normal cells. The drugs used in chemotherapy treatment interfere with or block the subdivision of cells, preferentially killing the rapidly dividing cancerous cells. The decedent had responded well to the chemotherapy treatment, continued to do limited work on his ranch, led an active life, and was treated as an outpatient from March 1974 to September 1974.

On September 22, 1974, decedent's estranged wife, Lucille, drove to the decedent's home, where she aimed a handgun at the decedent and fired three times from a distance of a few feet, striking the decedent in his abdomen. The decedent was immediately hospitalized and underwent surgery for treatment of the gunshot wound. Thereafter a dramatic change occurred in his condition. It was necessary to delay decedent's chemotherapy treatment for approximately two weeks, because the chemotherapy would prevent the growth of cells necessary to his healing from the surgery or the wound. Also, the chemotherapy would cause secondary infections and other complications.

While the chemotherapy treatment was withheld from the decedent, there was a rebound and rapid growth of the cancer, and the decedent remained hospitalized until his death on November 28, 1974. Decedent's death certificate listed the primary cause of death as tumor cachexia, a terminal state of cancer in which the body has a negative nitrogen balance, marked weight loss, propensity to infections, loss of strength, and a markedly diminished host resistance. The cancer had effectively overwhelmed the body's defenses.

 A person may be acquitted of criminal charges because guilt is not proven beyond a reasonable doubt, or a person may not even be tried but nevertheless may still be shown in a civil action to have been a willful slayer. Proof in a civil case need only be by a preponderance of the evidence. A criminal conviction is not a mandatory prerequisite to application of the slayer's statute. *Leavy, Taber, Schultz and Bergdahl v. Metropolitan Life Insurance Co.*, 20 Wash.App. 503, 581 P.2d 167 (Wash.App. 1978).

 The magistrate and the district court declined to apply the slayer's statute, on the grounds that the proximate cause of the decedent's death was cancer, not the gunshot wound inflicted by the appellant widow. We disagree. The clear and undisputed evidence supports the magistrate's finding that the gunshot wound hastened the decedent's death by weakening his physical condition and by interrupting his chemotherapy treatments, thus allowing the cancer, which had been controlled, to rebound and rapidly grow. We hold that the gunshot wound was a substantial factor and a proximate cause of the death of decedent, and therefore the slayer's statute ap-

plies to prevent Lucille Eliasen from inheriting from Edgar Eliasen's estate.

We note at the outset that the concept of proximate cause is exceedingly complex and difficult. Prosser says, regarding proximate cause:

> "There is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion. Nor, despite the manifold attempts which have been made to clarify the subject, is there yet any general agreement as to the proper approach." W. Prosser, *Handbook of the Law of Torts*, at 236 (4th ed. 1971).

A primary definition contained in Black's Law Dictionary states, "That which, in a natural and continuous sequence, unbroken by any efficient intervening cause, produces injury, and without which the result would not have occurred." *Black's Law Dictionary,* at 1103 (5th ed. 1979). The difficulty of that definition is apparent when one asks: What is a "natural sequence?" What is a "natural and continuous sequence?" When is an "intervening cause" efficient? *See* Seidelson, *Some Reflections on Proximate Cause,* 19 Duquesne L.Rev. 1 (1980). *See also* the frequently quoted statement in *Palsgraf v. Long Island Railroad,* 248 N.Y. 99, 162 N.E. 99, 103 (N.Y.1928):

> "What we do mean by the word 'proximate' is that because of convenience, of public policy, of a rough sense of justice, the law arbitrarily declines to trace a series of events beyond a certain point. This is not logic. It is practical politics." (Andrews, J., dissenting)

In the instant case, the magistrate had before him the testimony of two doctors relating to the cause of decedent's death. One stated that the drastic change in decedent's condition was attributable to the gunshot wound and that the gunshot wound was a contributing cause of the decedent's death:

> "A. The gunshot wound and the surgery following the gunshot wound was followed by drastic, detrimental changes in all—all aspects of the patient's health and condition—anything which would drastically influence the patient's general state of well-being would interfere with the effectiveness of the body's defenses and control of cancer.
>
> "Q. Would that then be a contributing cause to his death?
>
> "A. Yes.
>
> " * * *
>
> "Q. Let me ask you a question then again calling upon—upon your medical expertise and within the realm of reasonable, medical probability (certainty) had it not been for a gunshot wound in Mr. Edgar Eliasen's case, would he have, in fact, lived a longer life than he lived? And when I say gunshot wound, I'm referring to the gunshot wound and the subsequent surgery to repair the damage done by the gunshot wound?
>
> "A. He had—his condition was far or more advantageous or far better before the gunshot wound than after it.
>
> "Q. All right, sir. As his treating physician, barring any gunshot wound or trauma or injury that might have affected the growth of the cancer, would you have expected him to tolerate this cancerous condition longer than he did?
>
> "A. I would expect *much longer.*"

The physician clearly believed that the gunshot wound was a substantial, *i.e.,* proximate, cause of the decedent's death, notwithstanding the fact that the gunshot wound alone would not have been fatal. He believed that the decedent would have lived substantially longer, were it not for the gunshot wound which interrupted the chemotherapy treatments and drastically reduced decedent's physical strength.

The second doctor indicated that adenocarcinoma is one of the most difficult cancers to treat, and that the probability was ten per cent that the decedent would have lived one year from the time the cancer was diagnosed, but this doctor stated:

> "A. I believe that, from reviewing the records, that he would have died of the adenocarcinoma of the stomach in any event. I don't believe that the gunshot

wound was either necessary or sufficient to explain his death. *I do believe that it was a contributing factor,* in the sense that *it may have hastened his death by weeks* because of its effect on his stomach and because of the fact that it necessitated a 2-week discontinuance of his chemotherapy."

The magistrate found that "[t]he gunshot wound inflicted upon the deceased by Lucille Eliasen delayed treatment of the decedent and may have caused the death of the decedent from cancer to occur sooner than it may otherwise have occurred." He also found, however, that "[t]he gunshot wound inflicted by Lucille Eliasen was not the cause of death of the decedent," but that "cancer was the cause of the decedent's death and would have resulted in his death, whether or not the gunshot shot [sic] had been inflicted." As a matter of law, the magistrate held:

"For a person to be a slayer, it is necessary that the wound inflicted by that person is the proximate, that is to say the direct cause of the decedent's death... The gunshot wound inflicted by Lucille Eliasen upon the deceased was not the cause of his death."

■■■■ We hold that the magistrate's conclusion that the wound inflicted must necessarily have been the "direct cause" of death was erroneous. The fact that the gunshot wound was not the immediate cause of death is not controlling. One accused of homicide cannot escape liability merely because the wound he inflicted is not by itself mortal or the immediate cause of death. A non-fatal wound is the legal cause of death if it started a chain of causation which led to death, and the one who inflicted such a wound has committed homicide. *State v. Michael,* 107 Ariz. 126, 483 P.2d 541 (Ariz.1971); *Commonwealth v. Cheeks,* 423 Pa. 67, 223 A.2d 291 (Pa.1966); *Houston v. State,* 220 Miss. 166, 70 So.2d 338 (Miss.1954). The gunshot wound involved here, by itself, was not fatal, since the wound had healed prior to the decedent's death and death would not have occurred "but for" the decedent's cancer.

However, the medical testimony clearly indicates that, except for the wound, the decedent would have lived for a longer period of time, *i.e.,* some weeks or some months. He may have lived a much longer period of time, and it is impossible to set a specific time framework. It is a certainty, however, that the decedent's death would not have occurred *when it did,* "but for" the gunshot wound. Hence, we hold that the gunshot wound caused the decedent's premature death.

It is a universally accepted rule that a tortfeasor takes his victim as he finds him and will be held responsible for the full extent of the injury, even though a latent susceptibility of the victim renders his injury far more serious than reasonably could have been anticipated. *Armstrong v. State,* 502 P.2d 440 (Alaska 1972); *Petition of Kinsman Transit Co.,* 338 F.2d 708 (2d Cir. 1964), *cert. denied,* 380 U.S. 944, 85 S.Ct. 1026, 13 L.Ed.2d 963 (1965); *Chase v. State,* 382 P.2d 457 (Okl.Cr.App.1963); *Vesey v. Vesey,* 237 Minn. 295, 54 N.W.2d 385 (Minn. 1952); *State v. Frazier,* 339 Mo. 966, 98 S.W.2d 707 (Mo.1936); *Rutledge v. State,* 41 Ariz. 48, 15 P.2d 255 (Ariz.1932); *McCahill v. New York Transp. Co.,* 201 N.Y. 221, 94 N.E. 616 (N.Y.1911); *Dumas v. State,* 159 Ala. 42, 49 So. 224 (Ala.1909); *Hopkins v. Commonwealth,* 25 Ky. 2117, 80 S.W. 156 (Ky.1904). Equally well established but less familiar is the principle that one whose wrongful conduct forwards a diseased condition and thereby hastens and prematurely causes death cannot escape responsibility, although the disease probably would have resulted in death at a later time. Thus, an act which accelerates death, causes death, according to both civil and criminal law. *Armstrong v. State, supra; Chase v. State, supra; Vesey v. Vesey, supra; Rutledge v. State, supra; McCahill v. New York Transp. Co., supra; Hopkins v. Commonwealth, supra; Rogers v. State,* 60 Ark. 76, 29 S.W. 894 (Ark.1894); *Baker v. State,* 30 Fla. 41, 11 So. 492 (Fla.1893); *Louisville & N.R. Co. v. Jones,* 83 Ala. 376, 3 So. 902 (Ala.1888); *State v. Smith,* 73 Iowa 32, 34 N.W. 597 (Iowa 1887).

A slayer's statute was under consideration by the Minnesota court in *Vesey v. Vesey, supra.* There, the decedent's children from a prior marriage alleged that the decedent's widow, knowing that any exertion might be fatal to decedent because of a serious heart ailment and chronic asthma, nevertheless coerced the decedent to walk with her through deep snow on a cold and windy day. After they had walked two blocks, the exertion and exposure caused the decedent's death. The Court there held that the complaint alleged a felonious homicide which would, if proved, preclude the widow from receiving any interest in the decedent's estate under Minnesota's slayer's statute. The court stated, "It is sufficient that the act complained of accelerated decedent's death, and the fact that he was in ill health and weak does not lessen the criminal responsibility." *Id.,* 54 N.W.2d at 387.

As stated by the Iowa court in *State v. Smith,* 73 Iowa 32, 34 N.W. 597, 601–602 (Iowa 1887):

"It surely ought not to be the law that because a person is afflicted with a mortal malady, from which he must soon die, whether his ailment be caused by natural or artificial causes, another may be excused for acts of violence which hasten or contribute to or cause death sooner than it would otherwise occur. Life at best is but of short duration, and one who causes death ought not to be excused for his act because his victim was soon to die from other causes, whatever they may be."

We note finally the provisions of I.C. § 15–2–803(n): "This section shall not be considered penal in nature, but shall be construed broadly in order to effect *the policy of this state that no person shall be allowed to profit by his own wrong,* wherever committed." (Emphasis supplied.) Here, the appellant widow has clearly been shown to be a "slayer" within the meaning of the statute. Hence, the lower court's holdings to the contrary are reversed.

## V. CONCLUSION.

In sum, we affirm the holding of the magistrate court characterizing the property in the estate as the sole and separate property of the decedent. The court's admission into evidence of the deposition of the decedent was correct and is affirmed. We affirm the award of attorney's fees to the personal representative of the decedent's estate, but reverse the award of attorney's fees to the appellant widow. Lastly, we hold that on the evidence presented, the slayer's statute, I.C. § 15–2–803, is applicable and precludes the appellant widow from "in any way acquir[ing] any property or receiv[ing] any benefit as a result of the death of the decedent," since she "shall be deemed to have predeceased the decedent." I.C. § 15–2–803.

The orders, decisions and holdings of the lower courts are affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion.

DONALDSON, C.J., concurs.

BAKES, J., concurs in the result.

McFADDEN, Justice, Retired, dissenting.
*Community Property*

Under long established principles of community property law the property in this case cannot by any stretch of the imagination be characterized as the separate property of Edgar.

In order to reach the conclusion it does, the majority makes assumptions not present in the record and relies on the findings of fact of the trial court which are unsupported by *any* evidence. The majority states that any profit from the farm itself had been spent by the parties and none of the farm income remained at the time of Edgar's death. This statement comes from the testimony of Lucille:

"Q. All right. During the period . . . that you were married, did you and Edgar spend as much money as you were making or you took in?

A. I assume we did. We don't have any of it left."

Contrary to the majority's assumption that this related to the farm income alone, it appears that the statement referred to the

income of both parties. Accepting as true the statement that none of the money was left at Edgar's death, the crucial question is, where did it go? Some of it was used to live on and some of it was used to purchase real and personal property. How much money and where it came from, i.e., separate assets or community assets, is unknown and the evidence and testimony adduced at trial sheds no light on the subject.

There is a rebuttable presumption that all property acquired during marriage is community property. *Stanger v. Stanger,* 98 Idaho 725, 571 P.2d 1126 (1977); *Guy v. Guy,* 98 Idaho 205, 560 P.2d 876 (1977); *Suter v. Suter,* 97 Idaho 461, 546 P.2d 1169 (1976).

A special application of the general presumption is the commingling doctrine. When separate and community funds are so commingled that it is impossible to trace the source of funds used to purchase any given asset, all assets purchased with commingled funds are community property. *Houska v. Houska,* 95 Idaho 568, 512 P.2d 1317 (1973). The trial court and the majority opinion correctly conclude that so long as the separate property of either spouse is identifiable and traceable, commingling of such separate property with community does not convert the separate property into community. *Stahl v. Stahl,* 91 Idaho 794, 430 P.2d 685 (1967); *Evans v. Evans,* 92 Idaho 911, 453 P.2d 560 (1969); *Ripatti v. Ripatti,* 94 Idaho 581, 494 P.2d 1025 (1972).

The presumption of community property places the burden of proof on the party asserting the separate character of the assets. *Speer v. Quinlan,* 96 Idaho 119, 525 P.2d 314 (1974); *Ramsey v. Ramsey,* 96 Idaho 672, 535 P.2d 53 (1975); *Guy v. Guy, supra.*

The majority concludes that Edgar's estate sustained its burden of proof by tracing the assets. The majority fails to point to any evidence to support its conclusion, and blindly quotes the trial court's findings of fact. With the exception of the Marsh Valley ranch and some of the equipment, all of the property was acquired during coverture. Consequently, the presumption ap-

plies and the burden is on the personal representative to prove the separate property character of the property. This court in *Stahl v. Stahl,* 91 Idaho 794, 797, 430 P.2d 685, 688 (1967), stated

"When the source of the property can be established with reasonable certainty and particularity as the separate property of one or the other, the effect of such presumption [that of being community] is overcome, and the property so traced retains its character as separate property."

When direct tracing is impossible, the party may employ indirect evidence in the form of an accounting. *Speer v. Quinlan, supra, Houska v. Houska,* 95 Idaho 568, 512 P.2d 1317 (1973); *Evans v. Evans,* 92 Idaho 911, 453 P.2d 560 (1969).

Separate and community property were commingled so as to make tracing impossible. The funds used to purchase the Marsh Creek ranch came from commingled funds.

While the principal from the sale of the ranch in Rockland would have been decedent's separate property because it was acquired before marriage, I.C. § 32–903, the interest on the balance due on the contract would have been community property, I.C. § 32–906. Contrary to the majority's attempt to liken it to an increase in stock, clearly this interest was a "rent or profit" to the community. There was no evidence as to how much of the $12,000 annual payments required by the contract was interest and how much was principal. Nor does the record indicate how much of the $12,000 annual payments went to Edgar and how much went to the others. It appears that the monies received from the contract on the sale of the Rockland ranch, both interest and principal, were deposited in decedent's checking account.

The sale of cattle also provided some of the funds used to make payments on the Marsh Creek ranch. Edgar testified in his deposition that he had 125 head of cattle when he bought the ranch. Lucille testified at trial that he had around 100 head of cattle. She also testified that the main source of income was the sale and purchase of the cattle; that every year Edgar sold

the calves and replaced some of the other cows. Edgar testified in his deposition that the money from the sale of the cows was placed in his bank account. The interest and principal on the sale of the Rockland ranch were commingled as was the money received from the sale of cattle acquired both before and after marriage. Although decedent owned cattle prior to marriage, *no evidence was introduced* regarding the sale price or the date of sale. Because the respective interests of the community and the separate estate are unknown, and because the estate failed to introduce evidence to segregate these interests, the general presumption of community property should prevail. Indicative of the lack of tracing is decedent's own testimony. In his deposition he stated that he had no records, and no way of dividing the money in his bank accounts between the sale of cattle owned before marriage and those cattle which represented the increase after marriage.

Specifically in *Gapsch v. Gapsch,* 76 Idaho 44, 277 P.2d 278 (1954) we held: "Where the parties have not only commingled, blended and confused, but treated, regarded and handled their separate funds and community funds in their bank accounts as one fund, it all becomes community." (Citations omitted.)

In *Gapsch v. Gapsch, supra,* and the cases cited therein, the parties maintained a joint bank account. The rule should be equally applicable when the parties maintain separate accounts and deposit both separate and community property in the accounts.

Further, in support of applying the general presumption, there is the fact that the Acequia ranch, the two trailers, and the cars were taken in the names of both *Edgar Eliasen and Lucille Eliasen, husband and wife.* Also, the cattle brand was in both names.

Since direct tracing is impossible, the estate seeks to avail itself of the *Houska-Evans* accounting method. This method involves proving that throughout the marriage community living expenses consumed or exceeded community income. Although the trial court made a finding of fact that

value of decedent's property was less at the date of his death than at the date of his marriage there is *no evidence* to support this finding. In *Evans v. Evans,* the court based its conclusions on the report of an accountant. In the recent case of *Martsch v. Martsch,* 103 Idaho 142, 645 P.2d 882 (1982), income tax records were introduced into evidence to show the community income. In *Houska* we held that the method of accounting involves proving that throughout the marriage community living expenses consumed or exceeded community income. Here, there was *no evidence* regarding either the community expenses or the community income or what funds were used to support the community. Consequently, the accounting method is inapplicable.

The trial court also found that decedent had less money at the time of his death than he had at the time of marriage, and in effect thus concluded that no community property came into existence and all the property was decedent's separate property. The trial court, however, failed to make findings as to decedent's value prior to marriage and his value at the date of his death. The record does not indicate the property value prior to marriage, although it does show its value at the date of death. Hence, the finding that decedent was worth less at the date of death than at the date of marriage is not supported by the record.

Regarding the majority's initial conclusion that the parties entered the marriage with separate property and they intended to retain the separate nature of the property, it ignores the rule that rents and profits of separate property are community property when acquired during coverture. I.C. § 32–906. Regardless of how the name appears on the account in which the funds were deposited, in the absence of proof of their separate character those accounts were community in nature. When separate funds were commingled with community funds, all funds presumably became community. As in any other type of property, a party asserting the separate character of the property has the burden of proof to

trace it. The estate has failed in its burden. If the parties intended to retain the separate character of the property (an assumption not based on the record), they should have kept the separate property separate, and not commingled it with community property. At a minimum, a person should keep records in order to overcome the presumption by tracing. None of these steps were taken in the instant case; consequently, the general presumption must apply.

As to the cattle, this court held, in *Ripatti v. Ripatti, supra,* that when the offspring of a cattle herd is periodically sold, the proceeds from the sale commingled with other revenue and the cattle pastured on the homestead, the cattle presumably are community property. The majority cites *Evans v. Evans, supra,* for the proposition that when the herd is merely maintained and not increased, the herd is separate in character. At the threshold, it is important to note that cattle do not just maintain themselves. They must be cared for, even minimally. The amount of labor and industry expended in their maintenance is community property. There was testimony that both Edgar and Lucille, as well as Lucille's children by a previous marriage, cared for the cattle.

Additionally, the herd was not merely "maintained," it increased and decreased over the years. Edgar sold and made replacement purchases every year. Applying community property law, the cows acquired after marriage are presumed community, the cows acquired before marriage presumably were Edgar's separate property. No records were kept of the cows, making it impossible to determine which cows were Edgar's and which were Edgar's and Lucille's. Consequently, all the cattle (here, the proceeds from sale of the cattle) must be considered community in nature.

Based on the foregoing, the record fails to support the trial court's finding that all property was the separate property of decedent. I would reverse this characterization of the property by the trial court.

### Slayer's Statute

The argument of the estate regarding the applicability of the slayer's statute, I.C. § 15–2–803, relates only to the family allowance, exempt property, and the homestead.

I.C. § 15–2–803 provides in pertinent part:

"Effect of homicide on distribution at death.—(a)(1) 'Slayer' shall mean any person who participates, either as principal or as an accessory before the fact, in the wilful and unlawful killing of any other person.

. . . . .

(3) . . . (b) No slayer shall in any way acquire any property or receive any benefit as a result of the death of the decedent, but such property shall pass as provided in the sections following.

(c) The slayer shall be deemed to have predeceased the decedent as to property which would have passed from the decedent or his estate to the slayer under the statutes of descent and distribution *or have been acquired by statutory right as surviving spouse* or under any agreement made with the decedent. . . . ."

For the slayer's statute to apply, the estate must prove that the widow acted in the wilful and unlawful killing of the decedent. It is undisputed that the widow shot the decedent on September 22, 1974, in the stomach; that decedent died November 28, 1974; that at the time of the shooting the decedent was suffering from stomach cancer and was undergoing chemotherapy. The only issue left to be resolved is whether the shooting by the widow was the proximate cause of decedent's death. The magistrate court answered this question in the negative which the district court affirmed.

Proximate cause is generally an issue for the jury unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds will construe the facts and circumstances one way. *Leliefeld v. Johnson,* 104 Idaho, 357, 659 P.2d 111 (1983); *Schaefer v. Elswood Trailer Sales,* 95 Idaho 654, 656, 516 P.2d 1168, 1170 (1973). Consequently, if the finding is supported by substantial and

competent evidence, it must be affirmed on appeal.

Decedent's death certificate was properly admitted into evidence. Under cause of death, disease or condition directly leading to death is written, "Tumor cachexia." Under antecedent causes is written, "Metastatic Ca of stomach adenocarcinoma of stomach" and under "other significant conditions" is written, "bullet wound of stomach."

I.C. § 39–263 is a portion of the vital statistics act of 1949 which establishes the duty to file certificates of death, birth, etc. I.C. § 39–263 provides:

"Evidentiary character of records and copies of records. —Any certificate filed in accordance with the provisions of this act and the regulations prescribed by the board, or any copy of such records or part thereof, duly certified by the state registrar, shall be prima facie evidence of the facts recited therein."

The death certificate being admitted into evidence, *Corey v. Wilson,* 93 Idaho 54, 454 P.2d 951 (1969), the burden was on the estate to prove that decedent did not die of the condition listed on the certificate but rather from the gunshot wound. The evidence supports the conclusion of the trial court and the district court. The gunshot would had healed before decedent's demise. Two depositions were taken of medical doctors and introduced as evidence in this case. Dr. Venzon is a pathologist and made his conclusions from the medical records. Dr. Marrow was decedent's treating physician at the time of death and was treating decedent for the cancerous condition. Dr. Venzon testified:

"Q I am asking for your understanding of cause of death. I guess I could rephrase my question, Doctor. Of what did Edgar Eliasen die?

A In my opinion, the cause of his death was the adenocarcinoma of the stomach.

Q Again, you are aware of this gunshot wound in September?

A Yes.

Q Did that have any effect on the spread of cancer, as far as you could tell from the medical records?

A I believe that, from reviewing the records, that he would have died of the adenocarcinoma of the stomach, in any event. *I don't believe that the gunshot wound was either necessary or sufficient to explain his death.* I do believe that it was a contributing factor, in the sense that it may have hastened his death by weeks because of its effect on his stomach and because of the fact that it necessitated a 2-week discontinuance of his chemotherapy."

And Dr. Marrow testified:

"Q Do you have an opinion as to the cause or causes of his death? . . . . And if so, what is that opinion within the realm of reasonable, medical probability (certainty)?

A Tumor cachexia, metastatic carcinoma of the stomach, secondary to adenocarcinoma of the stomach and with bullet wound of the abdomen being . . . a factor in his death."

Proximate cause has been defined as the "cause without which the result would not have occurred," *People v. Sam,* 71 Cal.2d 194, 77 Cal.Rptr. 804, 454 P.2d 700 (Cal. 1969); and in *Armstrong v. State,* 502 P.2d 440, 446 (Alaska 1972), "[b]y proximate cause is meant a direct cause, that is, a cause which, by direct and natural sequence, produced the death in question. To say it differently, the proximate cause of a thing is that cause which produces it and without which it would not have happened." Decedent was dying of cancer at the time of the gunshot and while it may have hastened his death by a matter of weeks, the testimony supports the lower courts' conclusion that the gunshot wound was not the proximate cause of his death. Because the gunshot wound was not the proximate cause of decedent's death, the slayer's statute is inapplicable. Findings of fact supported by substantial and competent evidence, though conflicting, will not be disturbed on appeal. *Foremost Ins. v. Putzier,* 627 P.2d 317, 102 Idaho 138 (1981).

I would affirm this portion of the trial court's decision.

BISTLINE, J., concurs.