# IN THE SUPREME COURT OF IOWA

No. 21–1043

Submitted September 14, 2022—Filed December 22, 2022

**STATE OF IOWA,**

  Appellee,

vs.

**JEFFREY LEE STENDRUP,**

  Appellant.

_____

Appeal from the Iowa District Court for Jasper County, Thomas P. Murphy, Judge.

The defendant challenges the sufficiency and weight of the evidence supporting his convictions for murder in the first degree and robbery in the first degree. **AFFIRMED.**

McDonald, J., delivered the opinion of the court, in which all justices joined.

Gary Dickey (argued) of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Kyle Hanson (argued), Assistant Attorney General, for appellee.

**McDONALD, Justice.**

During the course of a robbery, Jeffrey Stendrup beat Jeremy McDowell with a bat. McDowell, who was high on methamphetamine at the time, died of a cardiac arrhythmia during or immediately after the beating. Following a bench trial, Stendrup was convicted of robbery in the first degree and felony murder with robbery in the first degree serving as the predicate felony. In this direct appeal, Stendrup challenges the sufficiency and weight of the evidence supporting his convictions and contends he should not be held responsible for McDowell's death because he did not intend to cause McDowell's death.

I.

Stendrup and McDowell were longtime friends and drug-dealing associates. Stendrup sold methamphetamine to McDowell, and McDowell distributed it to others. In June 2018, their relationship deteriorated because Stendrup had an affair with McDowell's girlfriend. Stendrup was in a relationship with a woman named Shelley Christensen, and McDowell was in a relationship with a woman named Jaycie Sheeder. In June 2018, Christensen caught Stendrup in bed with Sheeder.

In retaliation, Christensen allegedly stole drugs, money, keys, and other personal items from Stendrup's apartment. Between June 17 and 19, Stendrup and McDowell exchanged angry text messages. In those messages, Stendrup accused McDowell of helping Christensen steal from Stendrup and of possessing some of the stolen items. McDowell was noncommittal in response to the allegations, sometimes intimating he had the items and other times intimating

he did not. In some of the messages, Stendrup threatened to assault McDowell. For example, he threatened, "[W]hen I see you I'ma beat your face to the ground you better give me all that shit back."

On June 20, Stendrup went to the Clive Police Department to report Christensen had stolen property from his apartment, his Honda, and his Cadillac. The report was recorded on an officer's body camera. Stendrup stated, "I'm going to kill that bitch if you don't find her." Apparently dissatisfied with the police's response, Stendrup stated, "I'm gonna take care of this myself." He stated that he and his friends were looking for Christensen and that the police better find her first or she would not "be around."

Stendrup made unsuccessful efforts to retrieve his property. On one occasion, Stendrup found out where his Honda was and went to retrieve it. He asked his friend Andrew Forrest to show up in case things got rough. Stendrup and Christensen exchanged some words, but Stendrup left without the Honda because the police were on the way. On another occasion, McDowell text messaged Stendrup and Sheeder with a tip regarding the location of the Cadillac. Stendrup called McDowell and left a voicemail, stating, "You better just give the keys, bud. Otherwise, I'm gonna come find you. I promise you."

Things came to a head shortly after midnight on the morning of June 22 at the residence of Dave Anderson and Doreen Coleman in Colfax. Anderson was a regular methamphetamine user, and he purchased methamphetamine from McDowell. Anderson's supply of methamphetamine had been disrupted by Stendrup and McDowell's disagreements. Anderson contacted Sheeder about

buying methamphetamine directly from Stendrup. Stendrup agreed to deal directly with Anderson, but Stendrup told Anderson he first needed to resolve his situation with McDowell.

The record is unclear on the exact details, but it appears Anderson arranged for McDowell to come to his residence and then told Sheeder about it. At 12:59 a.m. on June 22, Anderson and McDowell spoke on the phone for a few minutes. Not long after the phone call, McDowell arrived at Anderson and Coleman's residence. Around the same time, Stendrup placed several calls to his friend Forrest to come to Anderson's house and assist. Forrest later testified he was supposed to join Stendrup in Colfax but his "old lady" sensed "what's going on" and convinced him not to go.

At approximately 1:34 a.m. McDowell took a phone call from Sheeder. Unbeknownst to McDowell, Sheeder and Stendrup were already at the property. While the call was ongoing, Stendrup entered the residence with a bat and yelled, "Where's my shit?" Stendrup chased McDowell into the kitchen and beat him with the bat. Anderson heard glass breaking, observed some of the blows, and then ran out of the house. He found Sheeder going through his van, which McDowell had been using. The call between Sheeder and McDowell was still connected, so they could hear Stendrup inside the house beating McDowell while yelling, "Where's my shit?"

After failing to convince Sheeder to go into the home and intervene, Anderson went back into the home. He saw Stendrup and asked him to stop beating McDowell, but Stendrup refused. When Stendrup finally stopped, he

went outside. Stendrup warned Anderson to not tell anyone what happened otherwise he would "come back and burn [Anderson's] house down with [Anderson] and [his] girlfriend in it." Stendrup and Sheeder then left without taking anything with them.

Anderson reentered the house and found McDowell face-down on the floor. Anderson shook McDowell and called out his name, but McDowell was not responsive. Anderson told investigators McDowell never moved after the assault. Anderson did not call 911 at this time because he was concerned about the drugs in his home.

Coleman was not present at the house during the assault; she was at work. At 1:47 a.m. Anderson called Coleman at work, and he told her Stendrup had just killed McDowell. Video from Coleman's work shows she received the call, and audio shows Coleman shrieked and became distraught when she heard the news. After Anderson called Coleman, he gathered all of the drugs in his house and took them to his neighbor Tom Wearmouth's home for safekeeping.

Within minutes of receiving Anderson's call, Coleman called Sheeder. Phone records show Coleman and Sheeder spoke three times, at 1:56, 2:04, and 2:20 a.m. After this last call, Sheeder returned to Colfax to meet Anderson at his residence. Sheeder thought McDowell was still alive. They agreed Sheeder would take McDowell to a hospital. They tried to put McDowell in a van, but he was too heavy. They enlisted the help of Wearmouth. They eventually loaded McDowell into Anderson's van.

At around 3:00 a.m. Sheeder called the hospital requesting directions. She stated her friend had gotten beaten up and needed urgent care. The hospital employee advised Sheeder to call 911, which she did. Sheeder told the 911 dispatcher she was transporting an unconscious person who might not be breathing. The dispatcher directed Sheeder to meet law enforcement and emergency personnel at a local restaurant. When law enforcement and emergency personnel arrived at the restaurant, Sheeder was already there. A responding paramedic, Ryan Volk, testified McDowell had no pulse, was stiff, cyanotic, and cool. According to Volk, the cyanotic condition—meaning McDowell was blue in color from lack of blood flow—indicated McDowell "had not just died." Paramedics nonetheless took emergency life-savings measures, which were unsuccessful. McDowell was declared dead at 3:39 a.m.

At 5:16 a.m., Stendrup sent a Facebook message to his friend Julie Landry stating he "might be in trouble baby for real" and he needed her help. They met in person later that morning. Stendrup told Landry that Christensen and McDowell stole things from him, that he told the police about it, and that the police did not help him so he helped himself. He explained that he went to Colfax to get drugs and money from McDowell. He told Landry he hit McDowell with a bat and left him face-down on the floor. He told Landry he "wasn't sure if [McDowell] was still alive."

Local law enforcement became suspicious because of the inconsistencies in Sheeder's story. They tracked Anderson's van back to his residence and went to investigate. Anderson and Coleman were not at the residence when police

arrived. At the residence, law enforcement found signs of an altercation, including blood in the kitchen and on the living room sofa, a shattered oven door, and a displaced microwave. They found a bat in Sheeder's vehicle. The bat had McDowell's blood and Stendrup's fingerprints on it. At trial, Anderson identified the bat as the one Stendrup used to beat McDowell.

Law enforcement arrested Stendrup and Sheeder and charged both with, among other things, first-degree murder and first-degree robbery. On the defendants' motion, Stendrup and Sheeder's trials were severed. Sheeder's case was tried to a jury, and she was found guilty of first-degree murder, first-degree robbery, and being an accessory after the fact. Her convictions were affirmed on direct appeal. *State v. Sheeder*, No. 19–1716, 2021 WL 4891014, at *1, *6 (Iowa Ct. App. Oct. 20, 2021). Stendrup elected to proceed with a bench trial.

Prior to his trial, Stendrup pleaded guilty to additional charges of suborning perjury and tampering with a witness. Those charges arose when Stendrup caused a letter to be sent to Anderson asking him to change his story about hearing Stendrup yell "where's my shit" while beating McDowell with the bat. The letter requested Anderson call Stendrup's lawyer and "say you were high that night and felt pressure by the cops to say something else and you didn't want to get in trouble but you didn't hear Jeff say (where's my shit)." The letter stated Anderson would not "get in trouble by the cops they can't do anything to you." The letter said if Anderson did this, he would "be well compensated."

One focal point of Stendrup's trial was whether and to what extent the district court would allow the State to present evidence regarding the cause and

manner of McDowell's death. Prior to trial, Stendrup thrice moved in limine to exclude or limit the testimony of deputy state medical examiner Dr. Jonathan Thompson. Stendrup argued Dr. Thompson should not be allowed to opine on the cause and manner of McDowell's death based on this court's decision in *State v. Tyler*, 867 N.W.2d 136, 163 (Iowa 2015) (holding a medical examiner's cause and manner of death testimony inadmissible when it was not based on objective scientific or medical evidence). The district court largely agreed with Stendrup, ruling, "Dr. Thompson may not testify about his conclusion about cause and manner as set forth in the autopsy report. The report shall be appropriately redacted if the report is introduced." The district court did rule, however, that "Dr. Thompson may answer appropriate hypothetical questions based on evidence."

The autopsy report was admitted into evidence with the ordered redactions. With respect to findings made during the autopsy, Dr. Thompson testified he observed bruising on McDowell's body consistent with being struck with a bat as well as multiple sharp force injuries consistent with cuts from broken glass. Dr. Thompson opined the blunt force injuries alone were insufficient to cause McDowell's death.

Dr. Thompson testified regarding methamphetamine use and its physical effects on users. He testified methamphetamine can cause the release of norepinephrine, increased heart rate, elevated blood pressure, constriction of the coronary arteries, and cardiac arrhythmia, or abnormal heartbeat. Dr. Thompson explained any level of methamphetamine is potentially fatal but

studies have shown fatal concentrations of methamphetamine range from 1,000 to 14,000 nanograms per milliliter. Dr. Thompson testified it would be difficult to pinpoint the precise level of methamphetamine necessary to kill a particular person because each person has their own health profile and because methamphetamine users build a tolerance to the drug. In terms of health risk, the evidence showed McDowell was in poor health. He was a chronic methamphetamine user with coronary artery disease and pulmonary emphysema. Toxicology reports showed McDowell's blood contained 4,900 nanograms of methamphetamine per milliliter.

Dr. Thompson opined that an assault would cause the body to release norepinephrine as part of the "fight or flight" response. Too much norepinephrine can cause a faster heartbeat, which can induce fatal arrhythmia. This is particularly true when combined with methamphetamine use. Based on hypothetical questions, Dr. Thompson opined that a person similarly situated to McDowell, with the same health profile, would "have still been alive but for that assault." He explained:

> Q: Okay. Hypothetically, if you had someone with the exact same physical analysis as you had in Jeremy McDowell, combine that with the medical history I just told you, this hypothetical person, would you be able to come to a conclusion to a reasonable degree of medical certainty as to the cause of that person's death?
>
> . . . .
>
> A. Yes, I could.
>
> . . . .
>
> Q. What would that opinion be?

A. My opinion would be that that other individual died from a sudden cardiac arrhythmia in the setting of methamphetamine toxicity and an altercation with that other individual.

The district court found Stendrup guilty as charged and sentenced him to concurrent sentences of life in prison without the possibility of parole for the murder conviction and twenty-five years for the robbery conviction. The district court ordered the convictions for perjury and witness tampering to be served concurrent to each other but consecutive to the murder conviction.

## II.

The district court limited the evidence regarding cause and manner of death based on its interpretation of *Tyler*, 867 N.W.2d 136. The district court admitted the autopsy report with cause and manner of death redacted. The district court also allowed Dr. Thompson to answer hypothetical questions subject to Stendrup's objections but disallowed Dr. Thompson from providing a direct opinion regarding cause and manner of death. Stendrup objected to certain hypotheticals, arguing the hypotheticals were too close to the facts in the record. The district court did not immediately rule on the admissibility of the answers to the hypotheticals. The State requested a ruling on whether the district court was going to consider the answers to determine whether it needed to present additional evidence. The district court stated it would consider the answers, but, in its written verdict, the district court stated some of the hypotheticals may have gone too far.

The parties agree it is unclear from this record whether the district court sustained the objections to the hypothetical questions or only exercised caution

in not considering the hypothetical questions and answers in rendering its verdict. We are thus required to determine the permissible scope of testimony and the state of the record prior to directly addressing the sufficiency challenges. "Our review of these evidentiary rulings is for an abuse of discretion." *State v. Lacey*, 968 N.W.2d 792, 805 (Iowa 2021).

This state has "been committed to a liberal view on the admissibility of expert testimony." *Ranes v. Adams Lab'ys., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). Generally, "[t]here is no requirement that the expert be able to express an opinion with absolute certainty: 'an expert's lack of absolute certainty goes to the weight of his testimony, not to its admissibility.' " *State v. Buller*, 517 N.W.2d 711, 713 (Iowa 1994) (quoting *United States v. Cyphers*, 553 F.2d 1064, 1072–73 (7th Cir. 1977)). Typically, "cross-examination [is] the proper tool to explore weaknesses in the opinions" of an expert. *Tyler*, 867 N.W.2d at 189 (Waterman, J., concurring in part and dissenting in part). Admission of expert testimony is thus the general rule, and exclusion or limitation of expert testimony is the limited exception.

*Tyler* was one such exception. In *Tyler*, a mother was convicted of murder in the second degree for the death of her newborn son. *Id.* at 143 (majority opinion). The son was either stillborn or drowned shortly after birth. *Id.* at 151. After performing the autopsy and pathology examination, the medical examiner's (coincidentally, also Dr. Jonathan Thompson) opinion regarding cause and manner of death were "[u]ndetermined." *Id.* at 148. In his final report and at trial, however, the medical examiner opined the cause of death was bathtub drowning

and the manner of death was homicide. *Id.* Dr. Thompson's opinion changed based on statements the police reported the defendant made regarding her son's death. *Id.* We held "the district court abused its discretion in allowing the medical examiner to testify to the cause and manner of Baby Tyler's death because the medical examiner based his opinions primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to the police as opposed to objective, scientific, or medical evidence." *Id.* at 144.

The State requests we overrule *Tyler*, but we decline to do so. *Tyler* was a unique case. In that case, the medical examiner was not able to determine cause and manner of death based on "objective, scientific, or medical evidence." *Id.* at 144. Instead, the medical examiner's opinion was based "primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to the police." *Id.* The medical examiner admitted his opinion was not based on scientific expertise but solely on his belief in the mother's statements. *Id.* at 149–50. In holding the district court abused its discretion by allowing the testimony, we repeatedly explained the case was unique.[1] *Id.* at 153, 163, 165, 167. We also repeatedly emphasized Dr. Thompson's opinion was inadmissible because it was not based on objective, scientific, or medical evidence but instead was based

---

[1]*See Tyler*, 867 N.W.2d at 153 ("[W]e consider whether under the unique circumstances of this case, it was appropriate for Dr. Thompson to opine on the cause and manner of Baby Tyler's death."), 163 ("[W]e consider whether under the unique facts of this case, Dr. Thompson's opinions amounted to an impermissible comment on Tyler's credibility."), 165 (explaining "under the unique facts of this case," the medical examiner made an impermissible comment on credibility), 167 ("[U]nder the unique facts of this case, Dr. Thompson indirectly vouched for Tyler's credibility.").

"exclusively" or almost exclusively on crediting one side of Tyler's "inconsistent and uncorroborated statements to the police." *Id.* at 144.[2]

The unique circumstances presented in *Tyler* are not present here. In this case, Dr. Thompson's opinion was based on objective, scientific, and medical evidence that would have assisted "the trier of fact to understand the evidence or to determine a fact in issue." Iowa R. Evid. 5.702. Dr. Thompson explained physical assault triggers a physiological response in the victim, including the release of norepinephrine that can cause heart arrhythmia. He explained this response can be fatal, particularly where the victim has underlying medical conditions or where the victim is under the influence of methamphetamine.

Further supporting Dr. Thompson's opinion was the patient history. Unlike in *Tyler*, the patient history in this case did not come from a single disputed source. Here, multiple sources indicated McDowell was unresponsive immediately after the beating, including Anderson and Stendrup himself, who told Landry he left McDowell face-down in the house. McDowell's nonresponsiveness and the timing of his death were further evidenced by the

---

[2]*See Tyler*, 867 N.W.2d at 163 ("Dr. Thompson admitted that his opinions on the cause and manner of Baby Tyler's death were based primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police . . . . Instead, the record established Dr. Thompson's opinions were based primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police."), 165 ("Instead, Dr. Thompson's opinions on the cause and manner of Baby Tyler's death were based primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police."), 166 ("Dr. Thompson's opinions that the cause of death was bathtub drowning and the manner of death was homicide were based primarily, if not exclusively, on Tyler's statements."), 167 ("Instead, he based his opinions primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police."), 177 ("The district court abused its discretion in allowing Dr. Thompson to opine on the cause and manner of Baby Tyler's death because he based his opinions primarily, if not exclusively, on Tyler's inconsistent and uncorroborated statements to police as opposed to objective, scientific, or medical evidence.").

abrupt lack of phone communication after the assault and the testimony of paramedic Volk that McDowell had not just died.

Although the district court did not allow direct opinion testimony regarding cause and manner of death, it did allow Dr. Thompson to answer hypothetical questions based on the facts of this case. While this limitation on Dr. Thompson's testimony was more than Stendrup was entitled to under controlling law, allowing Dr. Thompson to respond to hypothetical questions was appropriate. *See State v. Boner*, 203 N.W.2d 198, 200 (Iowa 1972) ("One of the accepted ways in which an expert may give his opinion is by response to a hypothetical question."). "Rule 5.703 . . . preserves the hypothetical question as an alternative method for presenting factual information to an expert witness who is without independent knowledge of the matter at issue." 7 Laurie Kratky Dorè, *Iowa Practice Series Evidence* § 5.703:2, at 870 (2022–2023 ed. 2022) [hereinafter Dorè].

The district court's concern that some of the hypothetical questions may have gone "too far"—because they tracked the facts of the case—was unfounded. It is well established that an expert may not offer an opinion through the use of hypothetical questions "unless the facts then in the record or thereafter shown are such as will support the expression of such an opinion." *Boner*, 203 N.W.2d at 200. "[T]he hypothetical question and the expert's response are intended to assist the trier of fact by allowing the acceptance of opinion testimony based upon the facts assumed in the question, if the trier of fact should find the assumed facts to be true." 7 Dorè § 5.703:2, at 870. Here, Dr. Thompson's

opinions were based on assumed facts supported by record evidence. It was left to the district court, as finder of fact, to determine whether the assumed facts were true and to what extent the assumed facts supported the expert opinion.

We thus conclude the district court abused its discretion in limiting evidence regarding the cause and manner of McDowell's death. Specifically, the district court abused its discretion in requiring redaction of the autopsy report and in limiting Dr. Thompson's testimony regarding the cause and manner of death. The district court did not abuse its discretion in allowing Dr. Thompson to offer his opinion through the use of hypothetical questions based on facts supported by the evidence. Although the district court disclaimed reliance on the hypothetical questions in reaching its verdict, it did not sustain the objections to the hypothetical questions. We thus consider Dr. Thompson's opinion testimony as part of the record in this case when assessing the sufficiency of the evidence.

### III.

Stendrup contends there is insufficient evidence supporting his conviction for robbery in the first degree. Specifically, Stendrup argues there is insufficient evidence to establish he had specific intent to commit theft. Stendrup argues his robbery and murder convictions must both be vacated because robbery is the predicate felony underlying the felony-murder conviction. Our review is for the correction of legal error. *See State v. Mathis*, 971 N.W.2d 514, 516 (Iowa 2022).

"A person commits a robbery when, having the intent to commit a theft, the person [assaults another] to assist or further the commission of the intended

theft . . . ." Iowa Code § 711.1(1) (2018). When a person commits robbery while armed with a dangerous weapon, that person commits first-degree robbery. *Id.* § 711.2. Theft occurs when a person "[t]akes possession or control of the property of another, or property in the possession of another, with the intent to deprive the other thereof." *Id.* § 714.1(1).

With respect to this sufficiency challenge, Stendrup raises largely the same issues he raised at trial. He notes there is insufficient evidence to establish he and Anderson set up McDowell. He notes Forrest testified Stendrup asked him to help carry stuff to the car but did not ask Forrest to help him steal from or rob McDowell. He notes Anderson testified he believed Stendrup did not come over with the intent to rob McDowell. He notes Stendrup and McDowell were in a personal feud regarding their girlfriends and Stendrup was motivated by animus rather than an intent to steal. He notes the district court "grossly misrepresented" the record evidence by taking his words out of context. According to Stendrup, he did not just say "Where's my shit?" Instead, he said "Where's my shit? I'm going to kill you." According to Stendrup, the full statement shows he beat McDowell not to commit theft but for other reasons (presumably to kill him). He disputes who owned the van Sheeder was searching while Stendrup was beating McDowell. Finally, Stendrup notes he did not actually take anything from McDowell.

The district court found these arguments unpersuasive and found the defendant had the specific intent to commit theft. That "finding of guilt is binding upon us unless we find there was not substantial evidence in the record to

support such a finding. In determining whether there was substantial evidence, we view the evidence in the light most favorable to the State." *State v. Abbas*, 561 N.W.2d 72, 74 (Iowa 1997) (per curiam) (citation omitted). That is a highly deferential standard, and we draw all legitimate inferences and presumptions that may fairly and reasonably be deduced from the record in favor of the State. *State v. Tipton*, 897 N.W.2d 653, 692 (Iowa 2017). It is immaterial to our analysis that Stendrup may have intended to take back his property and that Stendrup was not actually successful in taking any property. *See* Iowa Code § 711.1(2) ("It is immaterial to the question of guilt or innocence of robbery that property was or was not actually stolen."); *Id.* § 714.4 (providing statutory claim-of-right defense to theft); *State v. Miller*, 622 N.W.2d 782, 785–86 (Iowa Ct. App. 2000) (stating statutory claim-of-right defense is a defense to theft only and not to robbery or burglary).

With that understanding, when the evidence is viewed in the light most favorable to the State, we conclude there is substantial evidence to support finding Stendrup had the specific intent to commit theft. He arrived at Anderson's home in the middle of the night. *See State v. Worthen*, 82 N.W. 910, 911 (Iowa 1900) ("People are not accustomed, in the nighttime, to enter the homes of others . . . with innocent purposes. The usual object is theft, and this is the inference ordinarily to be drawn . . . ."); *State v. Rockingham*, No. 15–0978, 2016 WL 6652350, at *6 (Iowa Ct. App. Nov. 9, 2016) (stating that entry into residence at night supports finding of intent to commit theft). He requested

Forrest accompany him to assist in taking property. He ambushed McDowell with a bat.

The record is replete with Stendrup's statements indicating intent to take property, including cars, keys, money, and drugs. He made those statements to the police. He made those statements to McDowell via text message and voicemail. He made those statements to Landry. Landry testified Stendrup told her he was hitting McDowell, "screaming that he wanted his money and he wanted his drugs." He made those statements directly to McDowell, demanding "his shit" while beating McDowell with a bat. Stendrup's argument that his statement, "Where's my shit? I'm going to kill you," negates his specific intent to commit theft is frivolous. The intent to commit theft and the intent to kill are not mutually exclusive.

There is substantial evidence supporting the district court's verdict.

IV.

We next address the sufficiency of the evidence establishing Stendrup caused McDowell's death. We begin our discussion of the issue by noting the law imposes no duty on a victim to be in sufficiently good health to withstand a beating at the hands of his robber. The criminal defendant takes his victim as he finds him. It is not the law that because a person is afflicted with an ailment, "whether his ailment be caused by natural or artificial causes, another may be excused for acts of violence which hasten or contribute to or cause death sooner than it would otherwise occur." *State v. Smith*, 34 N.W. 597, 601–02 (Iowa 1887); *see State v. Baldes*, 110 N.W. 440, 442 (Iowa 1907) ("Even accepting the

defendant's theory that the woman was afflicted with heart disease, yet, if his own brutal and inexcusable violence aggravated the diseased condition of his victim, or united therewith to cause her death sooner than it would have otherwise occurred, he cannot escape criminal responsibility for his act."); *State v. O'Brien*, 46 N.W. 752, 753 (Iowa 1890) ("The fact that [the deceased] was afflicted with a disease which might have proved fatal would not justify the wrongful acts of defendant, nor constitute a defense in law. Nor would ignorance on the part of defendant of the diseased physical condition of [victim] excuse his acts." (citation omitted)).

### A.

According to Stendrup, the State was required to prove but-for causation in this case. In other words, the State was required to prove but for Stendrup beating McDowell with a bat, McDowell would not have died. For this proposition, Stendrup relies on *Burrage v. United States*, 571 U.S. 204 (2014). The question in *Burrage* was whether a federal sentencing enhancement applied to a controlled substances violation where the defendant's sale of heroin may have contributed to the purchaser's death. *See Burrage*, 571 U.S. at 208–09. *Burrage* is not controlling on the question of state law presented here, and we need not discuss it any further.

Although we think *Burrage* largely irrelevant to the question presented in this case, we largely agree with Stendrup regarding the causation standard. Iowa law requires the State to prove Stendrup's conduct was a factual cause of McDowell's death. Generally speaking, "[t]he conduct of a defendant is a 'factual

cause of harm when the harm would not have occurred absent the conduct.' We have traditionally labeled this straightforward, factual cause requirement of causation the 'but for' test." *State v. Tribble*, 790 N.W.2d 121, 127 (Iowa 2010) (citation omitted) (quoting Restatement (Third) of Torts: Liab. for Physical and Emotional Harm § 26, at 346 (Am. L. Inst. 2010) [hereinafter Restatement (Third) of Torts]); *see State v. Tyler*, 873 N.W.2d 741, 748 (Iowa 2016) (applying but-for causation standard in affirming murder conviction), *superseded by statute on other grounds*, Iowa Code § 814.28 (2020); *State v. Hennings*, 791 N.W.2d 828, 836–37 (Iowa 2010) (applying but-for causation standard in affirming conviction under hate crime statute), *overruled on other grounds by State v. Hill*, 878 N.W.2d 269 (Iowa 2016); *State v. Marti*, 290 N.W.2d 570, 585 (Iowa 1980) ("Factual causation is often expressed in terms of the sine qua non test: but for the defendant's conduct, the harm or damage would not have occurred.").

Stendrup argues the State failed to prove but-for causation here, but his argument rests on a misstatement of the record evidence. According to Stendrup, the evidence showed the assault, standing alone, did not cause McDowell's death. That statement is correct. Dr. Thompson did testify "the physical component of the injuries themselves only involved the skin." He further testified "from an anatomic standpoint" the assault was "not sufficient alone to kill Jeremy McDowell." Stendrup further argues the evidence showed McDowell's methamphetamine use was an independently sufficient cause, and thus a but-for cause, of McDowell's death. On this point, Stendrup misstates the record.

There is no evidence in this record that McDowell would have died from a methamphetamine overdose independent of Stendrup's assault. Dr. Thompson did testify use of methamphetamine in any amount is potentially fatal. However, he did not testify that was true with respect to McDowell. The evidence showed McDowell was a longtime, chronic user of methamphetamine. The evidence further showed longtime, chronic users build a tolerance to methamphetamine. With a reasonable degree of medical certainty, Dr. Thompson specifically opined that the assault was a but-for cause of death:

> Q. Okay. Hypothetically, if you had someone with the exact same physical analysis as you had in Jeremy McDowell, combine that with the medical history I just told you, this hypothetical person, would you be able to come to a conclusion to a reasonable degree of medical certainty as to the cause of that person's death?
>
> . . . .
>
> A. Yes, I could.
>
> . . . .
>
> Q. What would that opinion be?
>
> A. My opinion would be that that other individual died from a sudden cardiac arrhythmia in the setting of methamphetamine toxicity and an altercation with that other individual.
>
> Q. Okay. In this hypothetical, with all of that information, **would that person have died or would that person have still been alive but for that assault,** with the hypothetical information I've given you?
>
> . . . .
>
> A. Yes, I believe they would.

(Emphasis added.)

Dr. Thompson further testified the assault and subsequent release of norepinephrine would have pushed the victim "over the edge . . . into that realm of -- of being dead." He explained the causal mechanism in great detail:

> Q. Okay. We were talking about activities that cause norepinephrine to be released. Would this hypothetical as assault be an activity that would cause that to be released?
>
> A. Yes.
>
> Q. So if someone had these -- the increased norepinephrine levels from recent methamphetamine use, how would the assault and its effect on the norepinephrine affect that person?
>
> A. They would be more than likely additive. So I think it's important to think of health as a continuum -- right? -- at one point you're a hundred percent healthy, whenever that is, at another point you're dead. When you use methamphetamine -- right? -- your -- your heart rate goes up, your blood pressure goes up, your blood vessels can constrict, which for the most part is things that you don't want; and so you shift towards that dead end of the spectrum.
>
> And then when you get assaulted, you're activating, again, that fight-or-flight mechanism, or the sympathetic nervous system, which is also what methamphetamine does. So your blood pressure can go up even higher. You can get blood vessel constriction. Your heart rate can go up. And so it shifts you towards that dead end of the spectrum. So they can be additive and, you know, increases the likelihood of entering into that ventricular fibrillation, or that abnormal heartbeat, that eventually kills you.
>
> Q. And specifically in this hypothetical, how would the fact that this person lost consciousness and responsiveness during or -- or immediately after the assault and never regain consciousness, how do those particular facts play into your opinion?
>
> . . . .
>
> A. Well, that would suggest that during that assault that, you know, he -- his -- his health spectrum went over the edge of -- of -- went into that realm of -- of being dead.

When the testimony is viewed in the light most favorable to the State, there is substantial evidence Stendrup's physical assault of McDowell was a factual or

but-for cause of McDowell's death. "The principles of causation normally associated with civil tort litigation are pertinent in criminal cases." *State v. Garcia*, 616 N.W.2d 594, 596 (Iowa 2000) (en banc). The "thin skull rule" or "eggshell plaintiff rule" is well established in our tort and criminal law. *See, e.g.*, *Benn v. Thomas*, 512 N.W.2d 537, 539 (Iowa 1994) ("The 'eggshell plaintiff' rule . . . has its roots in cases such as *Dulieu v. White & Sons*, [1901] 2 K.B. 669, 679 . . . ."); *Baldes*, 110 N.W. at 442; *O'Brien*, 46 N.W. at 753; *Smith*, 34 N.W. at 601–02. In *Benn v. Thomas*, this court observed, "If a man is negligently run over or otherwise negligently injured in his body, it is no answer to the sufferer's claim for damages that he would have suffered less injury, or no injury at all, if he had not had an unusually thin skull or an unusually weak heart." 512 N.W.2d at 539 (quoting *Dulieu*, 2 KB at 679).

The same principle holds here. "The rule is well settled that the consequences of an assault which is the efficient cause of the death of another are not excused, nor is the criminal responsibility for causing death lessened, by the preexisting physical condition" of a victim "unable to withstand the shock of the assault" or "without which predisposed condition the blow would not have been fatal." *State v. Luther*, 206 S.E.2d 238, 241–42 (N.C. 1974). Courts have routinely affirmed homicide convictions where the defendant's conduct resulted in the death of another arising out of the stress of the event. *See, e.g.*, *State v. Edwards*, 665 P.2d 59, 68 (Ariz. 1983) (en banc) (heart attack); *State v. Spates*, 405 A.2d 656, 661 (Conn. 1978) (heart attack); *Maynard v. State*, 660 So. 2d 293, 295 (Fla. Dist. Ct. App. 1995) (heart attack); *Cordero v. State*, 770 S.E.2d

577, 581–82 (Ga. 2015) (cardiac arrhythmia); *People v. Sims,* 869 N.E.2d 1115, 1134 (Ill. App. Ct. 2007) (heart attack); *Thomas v. State,* 436 N.E.2d 1109, 1111–12 (Ind. 1982) (heart attack); *State v. Shaw,* 921 P.2d 779, 784–86 (Kan. 1996) (heart attack); *State v. Vaughn,* 707 S.W.2d 422, 426 (Mo. Ct. App. 1986) (heart attack); *State v. Dixon,* 387 N.W.2d 682, 689 (Neb. 1986) (heart attack); *People v. Cable* (*In re Anthony M.*), 471 N.E.2d 447, 451–52 (N.Y. 1984) (fractured hip turned heart attack); *State v. Atkinson,* 259 S.E.2d 858, 863–64 (N.C. 1979) (heart attack).

## B.

Where factual cause asks whether a harm would have occurred but for a defendant's conduct, proximate cause asks whether there is "a sufficient causal relationship between the defendant's conduct and a proscribed harm." *Marti,* 290 N.W.2d at 584. "In *Thompson v. Kaczinski,* [774 N.W.2d 829 (Iowa 2009)] we bifurcated proximate cause into factual cause and scope of liability and adopted the Restatement (Third) of Torts risk standard for civil tort actions." *State v. Roache,* 920 N.W.2d 93, 101 (Iowa 2018). The scope-of-liability standard in civil tort cases "is intended to prevent the unjustified imposition of liability by 'confining liability's scope to the reasons for holding the actor liable in the first place.'" *Thompson,* 774 N.W.2d at 838 (quoting Restatement (Third) of Torts (Proposed Final Draft No. 1, 2005) § 29 cmt. *d,* at 579–80, now § 29, at 496). "We have not extended the Restatement (Third) of Tort's scope-of-liability analysis to criminal cases . . . ." *Roache,* 920 N.W.2d at 102. Stendrup requests that we do

so in this case, and he argues his conduct falls outside the scope of liability because he did not intend to cause McDowell's death.

We need not decide in this case whether to adopt the scope-of-liability standard in criminal cases because, with respect to felony murder, the legislature has resolved the proximate cause or scope-of-liability question. "The felony-murder rule aims to deter people from committing those felonies the legislature has deemed inherently dangerous to the life of others." *State v. Harrison*, 914 N.W.2d 178, 191 (Iowa 2018). "To promote deterrence, the rule transforms those felonies 'into first-degree murder if a person is killed in the course of the felony, even though the felon had no specific intent or premeditation otherwise necessary to elevate the killing of another into first-degree murder.'" *Id.* at 191–92 (quoting *Tribble*, 790 N.W.2d at 127–28). When a person engages in conduct dangerous enough to serve as a predicate felony for felony murder, as Stendrup did here, and when the person's conduct is the factual cause of the death of another while participating in the predicate felony, as Stendrup's was here, then the legislature has already determined as a policy matter that the person is guilty of murder in the first degree without regard to intent. Proximate cause or scope-of-liability are not at issue in felony-murder cases.

## V.

After the district court entered its findings of fact, conclusions of law, and verdicts, Stendrup moved for a new trial on the ground the verdicts were contrary to the weight of the evidence. The district court denied the motion on the record

at sentencing. In this appeal, Stendrup argues the district court's verdict on murder in the first degree is contrary to the weight of the evidence in three respects. First, he argues the district court's finding of factual cause is contrary to the medical evidence. Second, he argues the district court's findings are irreconcilable with the blood evidence at the scene. Third, he argues Anderson's testimony is so incredible that it should be treated as a nullity.

Iowa Rule of Criminal Procedure 2.24(2)(*b*)(6) allows a defendant to request a new trial when the verdict is "contrary to law or evidence." That means "contrary to the weight of the evidence." *State v. Ellis*, 578 N.W.2d 655, 659 (Iowa 1998). The purpose of granting a new trial based on the weight of the evidence is to avoid a miscarriage of justice in which the evidence preponderates heavily against the verdict. *Id.* at 658–59. It is "reserved for those situations in which there is reason to believe that critical evidence has been ignored in the fact-finding process." *State v. Grant*, 722 N.W.2d 645, 649 (Iowa 2006). "A district court should grant a motion for a new trial only in exceptional circumstances." *State v. Ary*, 877 N.W.2d 686, 705 (Iowa 2016).

"We generally review rulings on motions for new trial asserting a verdict is contrary to the weight of the evidence for an abuse of discretion." *Id.* at 706. Our review is not to determine whether the verdict is contrary to the weight of the evidence but only to determine whether the district court abused its considerable discretion in denying the motion. *See State v. Reeves*, 670 N.W.2d 199, 203 (Iowa 2003) ("On a weight-of-the-evidence claim, appellate review is limited to a review of the exercise of discretion by the trial court, not of the underlying question of

whether the verdict is against the weight of the evidence."). This is a deferential standard, and we will not reverse the district court's ruling absent a "clear and manifest abuse of discretion." *State v. Neiderbach*, 837 N.W.2d 180, 216 (Iowa 2013).

Stendrup's arguments do not entitle him to any relief. Stendrup does not contend the district court applied the wrong legal standard or otherwise abused its considerable discretion in denying his motion for new trial. Instead, he simply argues the verdict for murder in the first degree is contrary to the weight of the evidence. On appellate review, however, we do not reweigh the evidence and make an independent determination on whether the verdict was contrary to the weight of the evidence. *See id.* at 211–12; *Reeves*, 670 N.W.2d at 203. That determination was left to the discretion of the district court in the first instance. On appellate review, our task is simply to determine whether the district court manifestly abused its discretion.

On our review of the record, we find no manifest abuse of discretion in the district court's denial of Stendrup's motion for new trial. The district court applied the correct legal standard in ruling on the motion. There is no reason to believe the district court overlooked critical evidence favorable to the defendant. And because this was a bench trial, the district court necessarily assessed the credibility of the witnesses in reaching its verdict. *See State v. Wickes*, 910 N.W.2d 554, 571 (Iowa 2018) ("Wickes opted for a bench trial in this case, so the district court in reaching its verdict assessed the credibility of the witnesses.").

**AFFIRMED.**